1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Christopher D. Banys (State Bar No. 230038)
Richard C. Lin       (State Bar No. 209233)
cdb@banyspc.com
rcl@banyspc.com
BANYS, P.C.
1032 Elwell Court, Suite 100
Palo Alto, California 94303
Telephone:  (650) 308-8505
Facsimile:  (650) 353-2202

Attorneys for Plaintiff,
IXCHEL PHARMA, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| IXCHEL PHARMA, LLC,<br><br>               Plaintiff,<br><br>v.<br><br>BIOGEN INC.,<br><br>               Defendant. | Case No. 2:17-at-367<br><br>**COMPLAINT**<br><br><br><br><br><br>Jury Trial Requested |

Plaintiff Ixchel Pharma, LLC, for its Complaint against Defendant Biogen Inc., hereby alleges as follows:

**THE PARTIES**

1.      Plaintiff Ixchel Pharma, LLC ("Ixchel") is, and at all relevant times was, a corporation duly organized and existing under the laws of the State of California, having its principal place of business at 608 12th Street, Davis, California 95616.  Ixchel is a small biotechnology company that develops small-molecule drugs that ameliorate mitochondrial disease.

2.      On information and belief, Defendant Biogen Inc. ("Biogen") is, and at all relevant times was, a corporation duly organized and existing under the laws of the State of Delaware, having its principal place of business at 225 Binney Street, Cambridge, Massachusetts 02142.  Biogen is a

large biotechnology company that develops and sells medicines to treat a variety of diseases.  Biogen sells its biopharmaceutical products in many regions throughout the world, including in the United States, in the State of California, and in this judicial district.

## JURISDICTION AND VENUE

3.     This Court has original jurisdiction over Ixchel's federal antitrust claim in this action pursuant to 15 U.S.C. § 22 because Biogen transacts business within California and this judicial district.

4.     This Court has supplemental jurisdiction over Ixchel's California state law claims in this action pursuant to 28 U.S.C. § 1367 because those claims are so related to Ixchel's federal antitrust claim that they form part of the same case or controversy under Article III of the United States Constitution.

5.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties are diverse in citizenship and the amount in controversy exceeds $75,000.

6.     This Court has specific and/or general personal jurisdiction over Biogen because Ixchel's claims arise out of Biogen's substantial and purposeful contacts with California and this judicial district, and/or Biogen has established minimum contacts within California and within this judicial district such that the exercise of jurisdiction over it would not offend traditional notions of fair play and substantial justice.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) because Ixchel's claims arise out of Biogen's substantial and purposeful contacts with California and this judicial district, and Biogen continues to conduct business in California and this judicial district.

## FACTUAL BACKGROUND

8.     The case involves collusion and other anti-competitive conduct by Biogen designed to suppress the creation of a new treatment for Friedreich's ataxia, a debilitating, life-shortening, neuro-degenerative disorder that can occur in both children and adults.  Caring more about preserving its lucrative monopoly on dimethyl fumarate ("DMF") drugs than it does for the suffering of Americans with Friedreich's ataxia, Biogen wrongfully prevented Ixchel from bringing a new treatment to market.  Approximately one in 50,000 Americans suffer from Friedreich's ataxia and there is no FDA

approved treatment.

9.      Ixchel was co-founded in 2012 by Gino Cortopassi, a professor of Molecular Biosciences at U.C. Davis who has over 25 years of experience studying mitochondrial disease.  Dr. Cortopassi is Ixchel's CEO.

10.      Since 2012, Ixchel has been working on the development of a therapeutic drug to treat Friedreich's ataxia.  The active pharmaceutical ingredient ("API") in Ixchel's experimental therapeutic drug is DMF.  Ixchel holds an Orphan Drug Designation ("ODD") in the United States for the use of DMF to treat Friedreich's ataxia.

11.      Forward Pharma FA ApS ("Forward") is a biotechnology company headquartered in Denmark and with offices in Hawthorne, New York.  Forward, like Ixchel, is in the business of developing drugs containing DMF as an API for the treatment of neurological diseases.  One of Forward's experimental drugs in development is FP187, a drug containing DMF as an API for the treatment of neurological diseases such as multiple sclerosis.

12.      Biogen markets and sells the drug Tecfidera for use in the treatment of multiple sclerosis.  The API in Tecfidera is DMF.  In 2016, Biogen's annual revenue from sales of Tecfidera was nearly $4 billion.

13.      The relevant product market is drugs containing DMF as an API for the treatment of neurological diseases.

14.      The relevant geographic market is the United States.  The extensive regulation of drugs in the United States by the U.S. Food & Drug Administration ("FDA") – including drugs for the treatment of neurological diseases – substantially limits the ability of drug products sold outside of the United States to compete domestically.

15.      Biogen has market power in the market for drugs containing DMF as an API for the treatment of neurological diseases in the United States.  Biogen's Tecfidera product is currently the only drug containing DMF as an API approved by the FDA for use in the United States to treat any neurological disease.  Specifically, Tecfidera is approved by the FDA for the treatment of multiple sclerosis.

16.      A drug containing DMF as an API approved by the FDA for treatment of one particular

type of neurological disease can potentially be used to treat other types of neurological diseases. For example, physicians in the United States are permitted to prescribe FDA-approved drugs for "off-label" uses if the physician determines that it is medically appropriate to do so. Thus, a drug that is approved for only one indication by the FDA can nevertheless be prescribed by physicians for other, non-approved indications.

17.    Because of this practice of "off-label" usage, any drug containing DMF as an API that is approved by the FDA to treat any neurological disease (such as Friedreich's ataxia) in the future constitutes a competitive threat to Biogen's sales of Tecfidera, as such a product would share the same API as and be reasonably interchangeable with Tecfidera.

18.    As a result of regulation, the cost of development, and other factors there are substantial barriers to entry in the market for drugs containing DMF as an API for the treatment of neurological diseases. Because it is a small company, Ixchel lacks the resources to bring its Friedreich's ataxia treatment to market without a partner.

19.    Forward, Biogen, and Ixchel are competitors in the market for drugs containing DMF as an API for the treatment of neurological diseases.

20.    In January 2016, Ixchel entered into a Collaboration Agreement with Forward. Under the terms of the Collaboration Agreement, Ixchel agreed to transfer ownership of the ODD for the use of DMF to treat Friedreich's ataxia to Forward. Ixchel also agreed to assign certain patent rights that it possessed relating to its development work on DMF therapies to Forward. In return, Forward agreed to work with Ixchel on a development program for a new drug that would contain DMF as an API for the treatment of Friedreich's ataxia ("the new DMF drug").

21.    In this development program, Forward would first investigate the feasibility of conducting cost-effective clinical trials for the new DMF drug. If Forward determined that such clinical trials were feasible, then under the terms of the Collaboration Agreement Forward would be responsible for carrying out those clinical trials and for paying for all of their costs.

22.    Under the Collaboration Agreement, assuming that the clinical trials were successful and resulted in FDA approval of the new DMF drug, the parties agreed that Forward would be responsible for managing the manufacturing and commercialization of the drug, and for paying all of

the costs associated with that process.  Furthermore, Ixchel would be entitled to receive a percentage royalty on sales of the approved product.

23.     In October 2016, Forward informed Ixchel that it had confirmed the feasibility of conducting cost-effective clinical trials for the new DMF drug, and that it would be moving forward with developing and implementing these clinical trials.  Forward and Ixchel subsequently began working together on logistics for setting up the clinical trials of the new DMF drug.

24.     At the same time that Ixchel and Forward were working together under the terms of the Collaboration Agreement, however, Forward was involved in a dispute with Biogen relating to the ownership of intellectual property rights to various patents and patent applications relating to the use of DMF as a therapeutic.

25.     On information and belief, Biogen viewed Ixchel and Forward's work in the development of a new DMF drug as a competitive threat to its sales of Tecfidera and its control over the market for DMF drugs for treating neurological diseases.  On information and belief, Biogen knew that to maintain its dominance in this market, it needed to thwart the efforts of Ixchel and Forward to develop and obtain FDA approval for their new DMF drug.

26.     Unbeknownst to Ixchel, at some point in time in late 2016, Forward was secretly negotiating a deal with Biogen that would settle the intellectual property dispute between the parties, take Forward out of the DMF drug market permanently, and protect Biogen's market dominance in the DMF drug market.  Specifically, Biogen colluded with Forward to end Forward's collaboration with Ixchel and the development of Ixchel's Friedreich's ataxia treatment.

27.     During the negotiations between Biogen and Forward, Forward shared the terms of the Collaboration Agreement with Biogen, even though the agreement contains a confidentiality provision prohibiting such disclosure without Ixchel's prior consent, which Ixchel had not provided.  On information and belief, Biogen and Forward knew they were violating this confidentiality provision in the course of their discussions regarding the agreement.

28.     As part of the deal ultimately reached between Biogen and Forward as a result of these negotiations, the two companies agreed that Forward would terminate its relationship with Ixchel, that neither Forward nor Biogen would have any dealings with Ixchel or its co-founder and CEO Dr.

1  Cortopassi, and that neither company would provide Ixchel with any assistance with respect to the

2  development of any drugs involving the use of DMF.

3          29.     On or about January 17, 2017, Forward and Biogen finalized their deal by entering into

4  a Settlement and License Agreement ("the Forward-Biogen Agreement").  As part of the Forward-

5  Biogen Agreement, Biogen agreed to pay Forward $1.25 billion in cash.  In addition, Section 2.13 of

6  the Forward-Biogen Agreement contains the following provision that relates specifically to Ixchel:

7

8          SECTION 2.13. Ixchel. Each of the Additional Parties and Licensor [Forward] shall, and
        shall cause each of its respective controlled Affiliates to, terminate any and all existing,

9          and not enter into any new, Contracts or obligations to Ixchel Pharma LLC, Dr. Gino
        Cortopassi and/or any other Person, to the extent related to the development by any of the

10          Additional Parties, Licensor or any of their respective controlled Affiliates of any
        pharmaceutical product having *dimethyl fumarate* as an API for the treatment of a human

11          for any indication, including Friedreich's ataxia.

12

13          30.     Furthermore, Appendix B to the Forward-Biogen Agreement, entitled "Licensed

14  Intellectual Property Contracts," specifically lists the Collaboration Agreement between Ixchel and

15  Forward.

16          31.     On or about January 18, 2017, Forward notified Ixchel that it had entered into the

17  Forward-Biogen Agreement and that, as part of that agreement, Forward was terminating the

18  Collaboration Agreement with Ixchel.  Forward has subsequently ceased all work with Ixchel with

19  respect to development of the new DMF drug, including any work relating to clinical trials for the new

20  DMF drug.

21          32.     As a result of Forward's breach of the Collaboration Agreement and its termination of

22  the agreement, Ixchel has been significantly impaired in its ability to continue with developing,

23  obtaining FDA approval, and bringing to market the new DMF drug.  Ixchel currently lacks the

24  funding and staffing to perform these activities on its own, and must now attempt to find another

25  development partner to assist with this process.  To date, Ixchel has been unable to find a new

26  development partner for the new DMF drug.  Biogen's unlawful and anticompetitive acts have

27  therefore caused a significant delay in Ixchel's development and commercialization of the new DMF

28

1  drug.

2     33.    As a result of Forward's breach of the Collaboration Agreement and its termination of

3  the agreement, Ixchel has also suffered financial harm in terms of lost revenue that Ixchel would have

4  received from Forward under the royalty sharing provision of the Collaboration Agreement for sales

5  of the new DMF drug.

6                              **FIRST CAUSE OF ACTION**

7              **Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

8     34.    Ixchel re-alleges and incorporates by reference the allegations set forth in the

9  paragraphs above.

10    35.    The market for drugs containing DMF as an API for the treatment of neurological

11  diseases is a relevant product market within the meaning of the antitrust laws.

12    36.    The relevant geographic market is the United States.

13    37.    Biogen entered into an agreement with its direct competitor, Forward, to refuse to deal

14  with Ixchel in any activities relating to the development or commercialization of any drugs containing

15  DMF as an API for the treatment of neurological diseases.

16    38.    Biogen's conduct as discussed above has affected interstate commerce as well as

17  foreign commerce between one or more entities in the United States and one or more entities in a

18  foreign nation, with a direct, substantial, and reasonably foreseeable effect on commerce within the

19  United States.

20    39.    Ixchel has been injured by Biogen's conduct and will continue to suffer such injury

21  unless awarded the relief prayed for herein.

22    40.    Biogen's conduct as discussed above constitutes a *per se* violation of Section 1 of the

23  Sherman Act as an unlawful refusal to deal or group boycott.

24    41.    Alternatively, Biogen's conduct as discussed above also constitutes an unlawful

25  contract, combination, and/or conspiracy in restraint of trade, in violation of Section 1 of the Sherman

26  Act under the rule of reason.  Biogen has substantial market power in the market for drugs containing

27  DMF as an API for the treatment of neurological diseases in the United States, and Biogen's conduct

28  has caused substantial harm to competition in that market.  In addition, Biogen's conduct does not

result in any competitive benefits, or the competitive harm of its conduct substantially outweighs any competitive benefits.

42.     Ixchel is entitled to treble damages, costs of suit, and attorneys' fees for Biogen's violation of Section 1 of the Sherman Act under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## SECOND CAUSE OF ACTION

### Tortious Interference with Contract

43.     Ixchel re-alleges and incorporates by reference the allegations set forth in the paragraphs above.

44.     Ixchel entered into a valid contract with Forward.

45.     Biogen had knowledge of the contractual obligations between Forward and Ixchel.

46.     On information and belief, by the conduct alleged above and other conduct to be proven at trial, Biogen intentionally acted to cause Forward to breach the Collaboration Agreement with Ixchel and to disrupt the contractual relationship between Forward and Ixchel.

47.     Biogen has caused Forward to breach the Collaboration Agreement and disrupted the relationship between Forward and Ixchel.

48.     As a proximate result of Biogen's conduct, Ixchel suffered damages in an amount to be proven at trial.

49.     The aforementioned acts of Biogen were willful, oppressive, and malicious.  Ixchel is therefore entitled to punitive damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

50.     Ixchel re-alleges and incorporates by reference the allegations set forth in the paragraphs above.

51.     At all relevant times, Ixchel enjoyed an economic relationship with Forward.  This relationship held a probable future economic benefit and advantage to Ixchel.

52.     Biogen knew of the existence of this relationship and intentionally engaged in the wrongful conduct described above, and other conduct to be proven at trial, to interfere with and disrupt this relationship.

53.     As a result, this relationship was actually disrupted such that Ixchel was significantly impaired in its ability to continue its work in developing and obtaining FDA approval of its new DMF drug.

54.     As a proximate result of Biogen's conduct, Ixchel suffered damages in an amount to be proven at trial.

55.     The aforementioned acts of Biogen were willful, oppressive, and malicious.  Ixchel is therefore entitled to punitive damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Negligent Interference with Prospective Economic Advantage

56.     Ixchel re-alleges and incorporates by reference the allegations set forth in the paragraphs above.

57.     At all relevant times, Ixchel enjoyed an economic relationship with Forward.  This relationship held a probable future economic benefit and advantage to Ixchel.

58.     Biogen knew of the existence of this relationship, and knew that the relationship would be disrupted if it failed to act with reasonable care.

59.     Biogen, at a minimum, failed to act with reasonable care by negligently engaging in the wrongful conduct described above, and other conduct to be proven at trial, to interfere with and disrupt this relationship.

60.     As a result, this relationship was actually disrupted such that Ixchel was significantly impaired in its ability to continue its work in developing and obtaining FDA approval of its new DMF drug.

61.     As a proximate result of Biogen's conduct, Ixchel suffered damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Violation of California Business and Professions Code § 16700 *et seq*. (Cartwright Act)

62.     Ixchel re-alleges and incorporates by reference the allegations set forth in the paragraphs above.

63.     Biogen contracted, conspired, and combined to commit acts in restraint of trade.

64. The market for drugs containing DMF as an API for the treatment of neurological diseases is a relevant product market within the meaning of the antitrust laws.

65. The relevant geographic market is the United States.

66. Biogen's conduct as discussed above violates the Cartwright Act, California Business and Professions Code § 16700 *et seq*.

67. Ixchel has been injured by Biogen's conduct and will continue to suffer such injury unless awarded the relief prayed for herein.

68. Pursuant to California Business and Professions Code § 16750, Ixchel is entitled to treble damages, costs of suit, and attorneys' fees for Biogen's violation of the Cartwright Act.

69. In addition, because Biogen continues to do the acts complained of herein and, unless restrained and enjoined, will continue to do so, Ixchel is entitled to an injunction restraining Biogen, its agents, employees and representative and all persons acting in concert with it from engaging in further acts in restraint of trade.

## SIXTH CAUSE OF ACTION

**Violation of California Business and Professions Code § 17200 *et seq*. (Unfair Competition)**

70. Ixchel re-alleges and incorporate by reference the allegations set forth in the paragraphs above.

71. By the acts alleged in the preceding paragraphs, Biogen has committed business acts and practices that are unlawful and unfair in violation of California Unfair Competition Law ("UCL"), California Business and Professions Code section § 17200 *et seq*.

72. Biogen's business acts and practices are unlawful and unfair and violate the UCL. Biogen's acts include the unlawful restraint of trade and other acts of unfair competition covered by § 17200.

73. Because Biogen continues to do the acts complained of herein and, unless restrained and enjoined, will continue to do so, Ixchel is entitled to an injunction restraining Biogen, its agents, employees and representative and all persons acting in concert with it from engaging in further acts of unlawful, unfair, or fraudulent business acts or practices.

74. Additionally, Ixchel is entitled to any and all orders and judgments necessary to

compensate them for the harm caused to it by Biogen.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.      That Ixchel recover its actual and compensatory damages according to proof at trial;

2.      That Ixchel recover any unjust enrichment gained by Biogen as a result of its efforts to interfere with Ixchel's work relating to developing, obtaining FDA approval of, and commercializing a DMF drug for treating neurological diseases such as Friedreich's ataxia;

3.      That Ixchel recover treble its actual damages;

4.      That Ixchel be awarded pre- and post-judgment interest as permitted by law;

5.      That Ixchel be awarded punitive damages;

6.      That the Court award Ixchel its costs of suit and attorneys' fees;

7.      That Biogen, each of its officers, directors, employees, agents, representatives, servants, alter egos, and each person in active concert or participation with any of them, be restrained from:

(a)  further engaging in unlawful, unfair, or fraudulent business acts or practices;

(b)  further preventing or discouraging Forward and any other companies from collaborating with Ixchel in developing, obtaining FDA approval of, and commercializing any drugs containing DMF as an API for the treatment of any neurological diseases; and

8.      That the Court grant Ixchel such other and further relief the Court may deem just and proper.

**JURY TRIAL DEMAND**

Ixchel demands a trial by jury on all issues so triable.

1  Dated: April 4, 2017                    Respectfully submitted,

2

3                                          By:  _/s/ Christopher D. Banys_____
                                           Christopher D. Banys
4                                          Richard C. Lin
                                           cdb@banyspc.com
5                                          rcl@banyspc.com
                                           BANYS, P.C.
6                                          1032 Elwell Court, Suite 100
                                           Palo Alto, California 94303
7                                          Telephone:  (650) 308-8505
                                           Facsimile:   (650) 353-2202
8

9                                          **ATTORNEYS FOR PLAINTIFF**
                                           **IXCHEL PHARMA, LLC**
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28