Christopher D. Banys (State Bar No. 230038)
Richard C. Lin       (State Bar No. 209233)
Jennifer L. Gilbert    (State Bar No. 255820)
Christopher J. Judge   (State Bar No. 274418)
BANYS, P.C.
1032 Elwell Court, Suite 100
Palo Alto, California 94303
Telephone:  (650) 308-8505
Facsimile:  (650) 353-2202

Attorneys for Plaintiff,
IXCHEL PHARMA, LLC

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| IXCHEL PHARMA, LLC,<br><br>               Plaintiff,<br><br>v.<br><br>BIOGEN INC.,<br><br>               Defendant. | Case No. 2:17-cv-00715-WBS-EFB<br><br>**PLAINTIFF IXCHEL PHARMA, LLC'S OPPOSITION TO DEFENDANT BIOGEN INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>Date:  September 5, 2017<br>Time:  1:30 p.m.<br>Judge:  Hon. William B. Shubb<br>Location:  Courtroom 5 |

I. INTRODUCTION ..................................................................................................... 1

II. FACTUAL BACKGROUND ................................................................................... 4

    A. Ixchel and Its Collaboration Agreement with Forward ...................................... 4

    B. Ixchel and Forward's Progress in Clinical Trials for the New DMF Drug ............ 6

    C. Biogen's Interference with the Collaboration Agreement ................................... 7

    D. Ixchel's Asserted Causes of Action and Claims for Damages ........................... 10

III. LEGAL STANDARD ............................................................................................. 11

IV. ARGUMENT ......................................................................................................... 12

    A. This Court Has Diversity Jurisdiction as Well as Pendent Jurisdiction Over Ixchel's
       State Law Claims ......................................................................................... 12

    B. Ixchel Has Properly Pleaded a Claim for Tortious Interference with Contract .......... 13

    C. Ixchel Has Properly Pleaded Claims for Intentional and Negligent Interference
       with Prospective Economic Advantage .......................................................... 18

    D. Ixchel Has Properly Pleaded a Sherman Act Antitrust Claim ............................ 19

       1. Ixchel Has Suffered an Article III Injury in Fact ....................................... 20

       2. Ixchel Has Antitrust Standing ................................................................. 22

          a) Biogen Fails to Apply the Correct Five-Factor Test for Antitrust Standing .......... 22

          b) Ixchel's Damages Are Not Speculative ............................................... 22

          c) Ixchel Is an Active Participant in the DMF Drug Market ........................ 22

          d) Ixchel Had the Necessary Intent and Preparedness to Enter the DMF Drug Market . 22

       3. Ixchel Has Suffered an Antitrust Injury ..................................................... 33

       4. Ixchel Has Properly Pleaded a Substantive Sherman Act Claim .................... 36

a) Ixchel Has Properly Pleaded a Rule of Reason Violation ........................................... 36

b) Ixchel Has Properly Pleaded a *Per Se* Violation ....................................... 37

E. Ixchel Has Properly Pleaded a California Cartwright Act Claim............................ 38

F. Ixchel Has Properly Pleaded a Claim for California Unfair Competition.............................. 39

G. To the Extent the Court Finds any Deficiencies in the Factual Allegations in the Complaint, the Court Should Grant Ixchel Leave to Amend .................................................. 40

V. CONCLUSION.............................................................................................................. 40

**TABLE OF AUTHORITIES**

**Cases**

*AFMS, LLC v. United Parcel Serv. Co.*, No. 10-05830 MMM (RCx), 2011 WL 13135632
(C.D. Cal. May 27, 2011) ................................................................................................ 28

*AFMS, LLC v. United Parcel Service Co.*, No. 10-05830 MMM (AJWx), 2011 WL 13128436
(C.D. Cal. Nov. 23, 2011) ................................................................................................ 34

*American Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051 (9th Cir. 1999) .............................. 22,23,24,25

*Amgen Inc. v. Hoffman-La Roche Ltd.*, 480 F. Supp. 2d 462 (D. Mass. 2007) ........................................ 24

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001) .............................................. 31

*Asahi Kasei Pharma Corp. v. Actelion Ltd.*, 222 Cal. App. 4th 945 (2013) ................................. 16,17,21

*Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569 (S.D.N.Y. 2011) .............................. 34

*Bell v. Dow Chem. Co.*, 847 F.2d 1179 (5th Cir. 1988) .......................................................................... 33

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999) ...................................... 35

*Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) .......................................................................... 21

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ................................................................... 28

*BNLfood Investments Ltd. SARL v. Martek Biosciences Corp.*, No. WDQ-11-0446,
2011 WL 6439451 (D. Md. Dec. 14, 2011) ..................................................................... 32

*BNSF Ry. Co. v. O'Dea*, 572 F.3d 785 (9th Cir. 2009) .......................................................................... 13

*Brian Clewer, Inc. v. Pan Am. World Airways, Inc.*, 674 F. Supp. 782 (C.D. Cal. 1986) ...................... 27

*Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 90 F. Supp. 2d 540 (D.N.J. 2000) ................................ 24

*Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.*, No. 03-232, 2004 WL 1427136
(E.D. Pa. June 21, 2004) ................................................................................................. 31

*Brown v. Visa U.S.A., Inc.*, 674 F. Supp. 249 (N.D. Ill. 1987) .............................................................. 37

*Bubar v. Ampco Foods, Inc.*, 752 F.2d 445 (9th Cir. 1985) ................................................................... 29

*Cargill Inc. v. Budine*, No. CV-F-07-349-LJO-SMS, 2007 WL 2506451 (E.D. Cal. Aug. 30, 2007) ..... 28

*Cellular Plus, Inc. v. Superior Court*, 14 Cal. App. 4th 1224 (1993)........................................................ 39

*Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ............................. 40

*Cianci v. Superior Court*, 40 Cal. 3d 903 (1985)..................................................................................... 39

*Cook v. Brewer*, 637 F.3d 1002 (9th Cir. 2011) ...................................................................................... 11

*County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001)........................................... 38

*Crown Oil Corp. v. Superior Court*, 177 Cal. App. 3d 604 (1986) .......................................................... 39

*CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099 (9th Cir. 2007) ......................... 18

*Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974 (N.D. Cal. 2010)...................................... 35

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376 (1995) ............................................... 18

*DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119 (N.D. Cal. 2010)............................................ 35

*Doe v. United States*, 58 F.3d 494 (9th Cir. 1995).................................................................................... 11

*Eisai Inc. v. Sanofi-Aventis U.S., LLC*, No. 08-4168 (MLC), 2010 WL 3172187
    (D.N.J. Aug. 10, 2010) ........................................................................................................................ 27

*Eon Labs., Inc. v. Smithkline Beecham Corp.*, 298 F. Supp. 2d 175 (D. Mass. 2003) ............................ 32

*Ethypharm S.A. France v. Abbott Labs*, 707 F.3d 223 (3d Cir. 2013)................................................. 25,26

*Exhibitors' Serv., Inc. v. American Multi-Cinema, Inc.*, 788 F.2d 574 (9th Cir. 1986) ......................... 29

*FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013)........................................................................................... 38

*Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 466 F.3d 961 (11th Cir. 2006)........................ 23

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015)................... 33,34

*Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738 (1976)......................................................... 11

*In re Air Passenger Computer Reservations Sys. Antitrust Litigation*, 694 F. Supp. 1443
    (C.D. Cal. 1988) ............................................................................................................................. 37,38

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460 (9th Cir. 1993)...................... 29

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 536 F. Supp. 2d 1129
    (N.D. Cal. 2008) .................................................................................................................................. 29

*In re GlenFed Sec. Litig.*, 42 F.3d 1541 (9th Cir. 1994)........................................................................... 17

*J'Aire Corp. v. Gregory*, 24 Cal. 3d 799 (1979)......................................................................19

*Knevelbaard Diaries v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2002) ...................... 35,39,40

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) ................................. 14

*Legal Econ. Evaluations, Inc. v. Metro. Life Ins.*, 39 F.3d 951 (9th Cir. 1994) ...................... 28

*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000) ................................................................. 11,40

*Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291 (S.D. Cal. 2009) ....................................... 29

*Los Angeles Mem'l Coliseum Comm'n v. National Football League*, 791 F.3d 1356 (9th Cir. 1986) .... 21

*Mattera v. Biosurface Eng'g Techs., Inc.*, No. CV 13-08991-R, 2014 WL 12586482
   (C.D. Cal. Feb. 5, 2014) .......................................................................................... 10

*Naffe v. Frey*, 789 F.3d 1030 (9th Cir. 2015) ..................................................................... 12

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ................................................................. 4,11

*Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir. 1984) .................................................. 28

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (1990)............. 14,15,17,19

*Popescu v. Apple Inc.*, 1 Cal. App. 5th 39 (2016)............................................................... 15

*Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26 (1998)............................ 13,14,16

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139 (9th Cir. 1986)................. 27

*Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004) ....................................................................... 15

*Retrophin, Inc. v. Questcor Pharms., Inc.*, 41 F. Supp. 3d 906 (C.D. Cal. 2014) ............... 23,24,30,31,33

*Ritz Camera & Image, LLC v. SanDisk Corp.*, 772 F. Supp. 2d 1100 (N.D. Cal. 2011) .......... 9

*Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.*, 2 Cal. 5th 505 (2017)............... 16

*Santana v. County of Yuba*, No. 2:15-cv-00794 KJM-EFB, 2016 WL 1268107
   (E.D. Cal. Mar. 31, 2016)........................................................................................... 9

*Savage v. Pacific Gas & Elec. Co.*, 21 Cal. App. 4th 434 (1993) ......................................... 18

*Sebastian Int'l, Inc. v. Russolillo*, 128 F. Supp. 2d 630 (C.D. Cal. 2001)............................. 18

*SigmaPharm, Inc. v. Mutual Pharm. Co.*, 772 F. Supp. 2d 660 (E.D. Pa. 2011) .................... 26

*Solyndra Residual Trust v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027 (N.D. Cal. 2014) ..... 18,19

*Space Exploration Technologies Corp. v. Boeing Co.*, No. 05-07533 FMC (MANx),
2006 WL 7136649 (C.D. Cal. May 12, 2006) ................................................................................. 20,21

*Swenson v. National R.R. Passenger Corp.*, No. 2:14-cv-02629-KJM-CMK, 2016 WL 4160785
(E.D. Cal. Aug. 5, 2016) ....................................................................................................................... 17

*Taheny v. Wells Fargo Banks, N.A.*, No. S-10-2123 LKK/EFB, 2011 WL 1466944
(E.D. Cal. Apr. 18, 2011) ..................................................................................................................... 17

*Tanaka v. University of Southern California*, 252 F.3d 1059 (9th Cir. 2001) ........................................ 34

*Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853 (C.D. Cal. 2015) .......................................................... 29,32

*Topps Chewing Gum, Inc. v. MLBPA*, 641 F. Supp. 1179 (S.D.N.Y. 1986) ............................................ 37

*Weinstein v. Kirkman*, No. C13-076 9-JCC, 2013 WL 12121125 (W.D. Wash. Sept. 16, 2013) ........... 10

*World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467 (10th Cir. 1985) ........................................ 21

### Statutes and Other Authorities

28 U.S.C. § 1332 ....................................................................................................................................... 12

Fed. R. Civ. P. 9(b) ................................................................................................................................... 17

Fed. R. Civ. P. 12(b)(1) ........................................................................................................................... 12,13

Fed. R. Civ. P. 12(b)(6) ........................................................................................................................... 11

Fed. R. Evid. 802 ...................................................................................................................................... 10

# I.   INTRODUCTION

Plaintiff Ixchel Pharma, LLC ("Ixchel") respectfully submits the following opposition to Defendant Biogen Inc.'s ("Biogen") Motion to Dismiss Plaintiff's First Amended Complaint (Dkt. No. 20). Biogen's motion should be denied because Biogen fails to show any deficiency in the allegations set forth in Ixchel's First Amended Complaint ("FAC").

This case stems from Biogen's intentional acts to destroy Ixchel's business and prevent Ixchel from bringing an important new drug to the market for the treatment of Friedreich's ataxia, a debilitating, life-shortening, degenerative neuro-muscular disease for which there is currently no FDA-approved treatment. Ixchel is a small biotech company founded by a U.C. Davis professor that, since 2012, has been working on finding a cure for this crippling disease. Through its studies, Ixchel identified a compound called dimethyl fumarate ("DMF") as a promising therapy for the disease. In 2016, Ixchel entered into a Collaboration Agreement with another biopharmaceutical company, Forward Pharma FA ApS ("Forward"), under which the two companies agreed to work together to develop a drug to treat Friedreich's ataxia using DMF as an active ingredient. Ixchel and Forward were well on their way to developing this new DMF-based drug when Biogen stepped in to stop their work.

Biogen currently sells the blockbuster multiple sclerosis drug Tecfidera, which also contains DMF as its active ingredient and is the only DMF drug on the market in the United States. Realizing that Ixchel's new DMF drug posed a competitive threat to its sales of Tecfidera, Biogen concocted a scheme to thwart Ixchel's development efforts. Biogen approached Forward in secret and agreed to pay Forward over $1 billion in exchange for Forward's agreement to sever all business ties with Ixchel and cease any further development work on any DMF-based drug. Biogen induced Forward to terminate the Collaboration Agreement with Ixchel and refuse to continue any further development work on Ixchel's new DMF drug. Thus, Biogen effectively killed the development of Ixchel's new DMF drug by buying off Ixchel's partner, Forward. As a direct result, Biogen has stymied Ixchel's ability to bring the first-ever treatment for Friedreich's ataxia to patients suffering from the disease. Ixchel has now brought suit against Biogen, alleging claims of: 1) tortious interference with contract, 2) intentional and negligent interference with prospective economic advantage, 3) violations of federal and state antitrust laws, and

1    4) unfair competition.

2         Biogen does not deny that it acted intentionally to disrupt the contractual relationship between

3    Ixchel and Forward.  Indeed, Biogen admits that it did so because Ixchel's drug development contract

4    with Forward threatened Biogen's economic interests.  Instead, Biogen argues that its actions do not

5    violate any state or federal law.  Biogen is wrong.

6         First, Biogen's intentional disruption of the contract between Ixchel and Forward presents a

7    textbook case of intentional interference with contract under California law.  On this claim, Biogen

8    incorrectly argues that it cannot be liable because Ixchel has not pleaded any wrongful conduct

9    committed by Biogen separate from the interference itself.  But Biogen misstates the law.  In California,

10   a separate wrongful act is ***not*** a required element for a tortious interference with contract claim, because

11   interfering with another party's contract is considered a wrongful act in itself.  It is only with respect to

12   claims for interference with ***prospective economic advantage*** that California law requires a wrongful act

13   that is independent from the act of interference.

14        As for Ixchel's separate claims for intentional/negligent interference with prospective economic

15   advantage, Ixchel has in fact pleaded multiple wrongful acts by Biogen.  As alleged in the FAC,

16   Biogen's conduct constitutes a violation of the Sherman Act, the Cartwright Act, and California Unfair

17   Competition Law, all of which courts have found are proper bases to support an intentional or negligent

18   interference with prospective economic advantage claim.

19        On Ixchel's antitrust claims under the Sherman Act and California Cartwright Act, Ixchel has

20   sufficiently pleaded an actual as well as antitrust injury, and it has standing to assert the antitrust claims.

21   Biogen induced Forward to breach its contractual obligations to Ixchel, including the non-terminable

22   obligation to conduct and pay for clinical trial trials for the new DMF drug.  This is not a speculative

23   injury, as Biogen argues, but an actual financial loss that Ixchel has already suffered as a result of

24   Biogen's anticompetitive conduct.  In addition, Biogen's conduct was specifically targeted at Ixchel, as

25   plainly evidenced from the fact that Biogen's anticompetitive agreement with Forward specifically

26   required Forward to immediately cease all collaboration with Ixchel and its CEO.  Thus, Ixchel is a

27   direct victim of Biogen's anticompetitive conduct, and therefore stands as the best (and possibly only)

28

party who can bring an antitrust claim against Biogen.

Ixchel has also alleged sufficient facts to show that it had the necessary "intent and preparedness" to enter the DMF drug market. The experience of Ixchel's personnel in developing and commercializing drugs, the experimental studies Ixchel had already performed for the new drug, and the contract it had secured with Forward to commercialize the product all show that Ixchel was well on its way to bringing its product to the market and becoming a significant competitor to Biogen. Biogen also mischaracterizes Ixchel as a mere licensor in the agreement with Forward. Ixchel's agreement with Forward is titled a "Collaboration Agreement" for a reason – the agreement required both Ixchel and Forward to actively participate in the joint development and commercialization effort for the new DMF drug. Thus, Ixchel did more than simply license technology to Forward, as Biogen claims.

Biogen's assertion that Ixchel has not properly pleaded a relevant market also lacks merit. Biogen argues that Ixchel has defined the relevant market too narrowly, but the proper scope of the relevant market is a factual dispute that cannot be resolved at the pleading stage. In addition, Ixchel's claim that Biogen engaged in a *per se* antitrust violation does not require Ixchel to define a relevant market.

Furthermore, Biogen's argument that Ixchel lacks the necessary antitrust standing fails as to Ixchel's Cartwright Act claim as a matter of law. California courts have held that standing under the Cartwright Act is much broader than the Sherman Act, allowing anyone who has been "injured in his or her business or property" by reason of the alleged anticompetitive conduct to sue for a Cartwright Act violation, regardless of whether they are a competitor or consumer in the restrained market. The fact that Ixchel has been injured as a consequence of Biogen's conduct is therefore enough to give Ixchel standing to bring a Cartwright Act claim.

Finally, Ixchel has properly alleged a California UCL claim against Biogen. With respect to this claim, Biogen fails to identify any specific deficiency in Ixchel's pleading of this claim. Instead, Biogen simply argues that this claim is derivative of Ixchel's other claims and, since all the other claims should be dismissed, so should the UCL claim. But Biogen has not shown that Ixchel's other claims should be dismissed, so it has no basis to argue for the dismissal of the UCL claim.

1      Biogen acted to stop Ixchel from bringing a new drug to market that Biogen feared would hurt its

2  bottom line.  Biogen did so by intentionally interfering with Ixchel's contractual agreement with

3  Forward to develop a new treatment for Friedreich's ataxia – leaving Ixchel and those who suffer from

4  the disease with no approved treatment.  Biogen used its vast resources to take unlawful steps to

5  preserve its monopoly in DMF drugs at the expense of Ixchel and patients suffering from a horrible

6  disease nationwide, including in California.  Biogen's motion to dismiss this action should be denied.

7  **II.     FACTUAL BACKGROUND**

8      The FAC (Dkt. No. 17) contains the following factual allegations, which at the pleading stage

9  must be accepted as true.  *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

10     **A.     Ixchel and Its Collaboration Agreement with Forward**

11     Ixchel is a biotechnology company that develops small-molecule drugs that ameliorate

12  mitochondrial disease.  (FAC ¶ 1).  While Ixchel is a relatively small company, it is staffed by a group

13  of highly experienced individuals with a deep expertise in the biotech industry and the development of

14  new drugs.  Ixchel's CEO and co-founder is Gino Cortopassi, a professor of Molecular Biosciences at

15  U.C. Davis who has over 25 years of experience studying mitochondrial disease, including Friedreich's

16  ataxia.  (*Id.* at ¶ 9).  Ixchel's Advisory Board includes Dr. Robert Stein, a scientist with 25 years of

17  experience working in various executive and senior management positions at pharmaceutical companies

18  such as F. Hoffmann-LaRoche Ltd., KineMed, Inc., Incyte Corporation, Merck & Co., Ligand

19  Pharmaceuticals Inc., the DuPont Merck Pharmaceutical Company, and DuPont Pharmaceuticals

20  Company.  (*Id.* at ¶ 12).  Ixchel's Advisory Board also includes Dr. David Ferrick, who has over 15

21  years of R&D experience in drug discovery and previously held senior management positions at two

22  other biotech companies.  (*Id.* at ¶ 12).

23     Since 2012, Ixchel has been working on the development of a therapeutic drug to treat

24  Friedreich's ataxia.  (*Id.* at ¶ 10).  The active pharmaceutical ingredient ("API") in Ixchel's experimental

25  therapeutic drug is a compound called dimethyl fumarate ("DMF").  (*Id.*).  DMF has already been

26  approved by the FDA for use in the treatment of another neurological disease, multiple sclerosis.  (*Id.* at

27

28

¶ 17). That approval was secured by Biogen, which currently sells its DMF drug for the treatment of multiple sclerosis under the brand Tecfidera. (*Id.*).

Ixchel holds an Orphan Drug Designation ("ODD") in the United States for the use of DMF to treat Friedreich's ataxia. (*Id.*). An ODD is a designation that is granted by the U.S. Food & Drug Administration ("FDA") for a drug intended to treat a rare disease or condition. (*Id.* at ¶ 11). The sponsor of an ODD receives certain tax and other benefits from the government to facilitate the development of the drug. (*Id.*).

To help facilitate the development and commercialization of its new experimental drug, in January 2016 Ixchel entered into a Collaboration Agreement with Forward Pharma FA ApS ("Forward"). (*Id.* at ¶ 22). Forward is a biotechnology company based in Denmark with a market capitalization of around $700 – 800 million as of January 2017. (*Id.*). Forward, like Ixchel, is in the business of developing drugs containing DMF as an API for the treatment of neurological diseases. One of Forward's experimental drugs in development is FP187, a drug containing DMF as an API for the treatment of neurological diseases such as multiple sclerosis. (*Id.*). Given Forward's overlapping work in the development of DMF-based drugs and its substantial financial resources, Forward was a natural partner for Ixchel in its efforts to bring its experimental DMF drug to market.

Contrary to Biogen's assertion, Ixchel was not a mere licensor of technology to Forward under the Collaboration Agreement. Rather, as the title of the agreement accurately describes, Ixchel and Forward agreed to pool their respective resources to work together on a development program for a new drug that would contain DMF as an API for the treatment of Friedreich's ataxia ("the new DMF drug"). (*Id.* at ¶ 22).

In this development program, Forward would first assess the feasibility of conducting clinical trials for the new DMF drug. (*Id.* at ¶ 23). If Forward determined that such clinical trials were feasible, then under the terms of the Collaboration Agreement Forward would be responsible for carrying out those clinical trials and for paying for all of their costs. (*Id.*). Ixchel, in turn, would provide assistance with the clinical trials, including but not limited to the expertise of Dr. Cortopassi. (*Id.*). Furthermore,

the parties agreed that Forward's obligation to pay for and conduct the clinical trials would survive any termination of the agreement. (*Id.*).

Under the Collaboration Agreement, assuming that the clinical trials were successful and resulted in FDA approval of the new DMF drug, the parties agreed that Forward would be responsible for managing the manufacturing and commercialization of the drug, and for paying all of the costs associated with that process, with Ixchel providing assistance in the manufacturing and commercialization process. (*Id.* at ¶ 24). Furthermore, Ixchel would be entitled to receive a percentage royalty on sales of the approved product. (*Id.*). Ixchel also retained certain rights to engage in its own commercialization of the drug, independent of Forward. (*Id.*).

## B. Ixchel and Forward's Progress in Clinical Trials for the New DMF Drug

After Ixchel and Forward executed the Collaboration Agreement in January 2016, the parties moved forward in earnest on the development of their new DMF drug. In October 2016, Forward informed Ixchel that it had confirmed the feasibility of conducting cost-effective clinical trials for the new DMF drug, and that it would be moving forward with developing and implementing these clinical trials. (*Id.* at ¶ 25). Forward's confirmation of feasibility meant that it was now contractually bound to conduct and pay for these clinical trials. (*See id.* at ¶ 23). Forward and Ixchel subsequently began working together on logistics for setting up the clinical trials of the new DMF drug. One month later, in November 2016, Forward sent to Ixchel a detailed plan for a 20-patient, 48-week clinical trial study of the new DMF drug to treat Friedreich's ataxia, with patients recruited from four clinical sites in the United States, Germany, and Italy. (*Id.* at ¶ 25).

The new DMF drug has a good probability of being approved by the FDA for the treatment of Friedreich's ataxia, for several reasons. First, Friedreich's ataxia is caused by a deficiency of the protein frataxin, and pre-clinical studies conducted by Dr. Cortopassi and others have shown that DMF can increase frataxin levels. (*Id.* at ¶ 26). Pre-clinical studies by Cortopassi and others also demonstrate that there is a deficiency of mitochondria (the energy-generating portion of the cell) in Friedreich's ataxia patients, and that DMF can increases mitochondrial numbers. (*Id.*). In addition, DMF has already been shown to be safe for use in humans, and has already passed the FDA's phase I clinical trial requirements

(by virtue of the FDA's previous approval of Biogen's DMF product, Tecfidera).  (*Id.*).  Ixchel's

strategy of using an already-approved therapeutic to treat a new disease indication, known as "drug

repurposing," significantly increases the chances that it will be able to bring its new DMF drug to

market, as it allows Ixchel to rely on already-completed studies regarding the use of DMF in humans,

making the clinical path to approval much shorter and easier.  (*Id.*).

### C.    Biogen's Interference with the Collaboration Agreement

Unbeknownst to Ixchel, at some point in time in late 2016, Forward was secretly negotiating a

deal with Biogen that would settle a pending intellectual property dispute between Forward and Biogen,

take Forward out of the DMF drug market permanently, and protect Biogen's market dominance in the

DMF drug market.  (*Id.* at ¶ 29).  Specifically, Biogen colluded with Forward to end Forward's

collaboration with Ixchel and the development of Ixchel's Friedreich's ataxia treatment.  (*Id.*).

During the negotiations between Biogen and Forward, Forward shared the terms of the

Collaboration Agreement with Biogen, even though the agreement contains a confidentiality provision

prohibiting such disclosure without Ixchel's prior consent, which Ixchel had not provided.  (*Id.* at ¶ 30).

As part of the deal ultimately reached between Biogen and Forward as a result of these

negotiations, the two companies agreed that Forward would terminate its relationship with Ixchel, that

neither Forward nor Biogen would have any dealings with Ixchel or its co-founder and CEO Dr.

Cortopassi, and that neither company would provide Ixchel with any assistance with respect to the

development of any drugs involving the use of DMF.  (*Id.* at ¶ 31).  Consistent with this agreement, in

January 2017 Forward and Biogen executed a Settlement and License Agreement ("the Forward-Biogen

Agreement") that contains the following provision that relates specifically to Forward's relationship

with Ixchel:

> SECTION 2.13. Ixchel. Each of the Additional Parties and Licensor [Forward] shall, and
> shall cause each of its respective controlled Affiliates to, terminate any and all existing,
> and not enter into any new, Contracts or obligations to Ixchel Pharma LLC, Dr. Gino
> Cortopassi and/or any other Person, to the extent related to the development by any of the
> Additional Parties, Licensor or any of their respective controlled Affiliates of any
> pharmaceutical product having dimethyl fumarate as an API for the treatment of a human
> for any indication, including Friedreich's ataxia.

(*Id.* at ¶ 32).

Shortly thereafter, Forward notified Ixchel that it had entered into the Forward-Biogen Agreement and that, as part of that agreement, Forward was terminating the Collaboration Agreement with Ixchel. (*Id.* at ¶ 34). Forward has subsequently ceased all work with Ixchel with respect to development of the new DMF drug, including any work relating to the clinical trials that Forward was obligated to conduct for the new DMF drug under the terms of the Collaboration Agreement. (*Id.*). In addition, Forward has publicly announced that it will be suspending any further drug development work. (*Id.*).

Ostensibly, Forward has stated publicly that it is suspending any further development work pending the outcome of certain legal proceedings that are still continuing between Forward and Biogen relating to their intellectual property dispute. (*Id.*). In reality, however, Forward's cessation of its drug development work is a direct result of the Forward-Biogen agreement. This is because, under Section 2.13 of that agreement, Forward is required to "terminate any and all existing, and not enter into any new, Contracts or obligations to . . . any other Person, to the extent related to the development by . . . Licensor [Forward] or any of their respective controlled Affiliates of any pharmaceutical product having dimethyl fumarate as an API for the treatment of a human for any indication, including Friedreich's ataxia." (*Id.* at ¶ 32). In other words, Forward is now prohibited from entering into any contracts that have anything to do with the development of any drug having DMF as an active ingredient. Such a restriction effectively precludes Forward from engaging in ***any activities relating to the development of any DMF drug whatsoever***, since it is all but impossible to engage in any drug development work without signing contracts with others. Indeed, as even Biogen argues, the development of new drugs is a complicated process that requires the execution of many contracts with many parties, such as "agreements with prospective test subjects, physicians, or facilities necessary to conduct clinical trials." (Biogen Mot. at 18:11-13). Biogen's assertion that Forward retains the freedom to continue developing DMF drugs under the Forward-Biogen agreement is therefore incorrect.

As part of the compensation for Forward's agreement to completely exit the DMF drug market, Biogen agreed to pay Forward an upfront payment of over $1 billion as well as a percentage royalty on Biogen's sale of its Tecfidera product and any other DMF-based product Biogen may sell in the future.

1   (*See* Tsai Decl. (Dkt. No. 20-3), Ex. A at 10, 30-32).  The amount of royalty that Forward is to receive

2   from Biogen is dependent on the outcome of the various legal proceedings that are still pending between

3   Biogen and Forward relating to the parties' respective patent rights.  (*See id.* at 1, 30-32).[1]

4        Biogen's actions have allowed it to maintain its monopoly power over the alleged relevant

5   market of drugs containing DMF as an API for the treatment of neurological diseases, as Biogen's

6   Tecfidera product remains the only drug available in the United States for this market.  (*See* FAC ¶¶ 15-

7   17).  Importantly, Biogen argues that Ixchel has incorrectly defined the relevant market because,

8   according to Biogen, there are other non-DMF drugs on the market that are in competition with

9   Tecfidera.  (*See* Biogen Mot. (Dkt. No. 20-1) at 8:5-10).  In support of this argument, Biogen has

10  submitted three exhibits – an SEC filing by non-party Teva and two printouts from the website

11  www.clinicaltrials.gov – all of which are improper evidence and should not be considered by the Court.

12  (*See id.* at 8:19-25; Tsai Decl. (Dkt. No. 20-3), Ex. B-D).

13       "[O]n a motion to dismiss, the court does not consider evidence outside the complaint unless it is

14  subject to judicial notice or can be incorporated by reference."  *Santana v. County of Yuba*, No. 2:15-cv-

15  00794 KJM-EFB, 2016 WL 1268107, at *30 (E.D. Cal. Mar. 31, 2016).  Since the three exhibits are not

16  referenced in the FAC, Biogen asks the Court to take judicial notice of them.  This request should be

17  denied.  First, the SEC filing by non-party Teva is not proper evidence.  "[W]hile a court may take

18  judicial notice of the existence of SEC filings, it may not take judicial notice of documents for the truth

19  of disputed facts asserted therein."  *Ritz Camera & Image, LLC v. SanDisk Corp.*, 772 F. Supp. 2d 1100,

20  1109 (N.D. Cal. 2011).  Here, Biogen relies on Teva's statement in its SEC filing regarding who Teva

21  considers to be competitors to its product Copaxone.  (*See* Biogen Mot. at 8:19-21).  In effect, Biogen

22  offers the SEC filing to prove the truth of the statements made by Teva therein.  This constitutes

23  inadmissible hearsay, and should be rejected on that basis.  *See Ritz*, 772 F. Supp. 2d at 1109 ("This

24

25

26  [1] Given that Forward's compensation under its agreement with Biogen is contingent to some degree on
    the outcome of the pending legal proceedings between the parties, it is not surprising that Forward has
27  stated publicly that it is waiting to see what to do with respect to its drug development strategy until
    after those legal proceedings have been resolved.
28

Court declines to take judicial notice of the hearsay statements contained in the SEC filings at issue here."); Fed. R. Evid. 802.

The two printouts from the website www.clinicaltrials.gov are also not subject to judicial notice. Biogen argues that other courts have taken judicial notice of information from this website, but in both cases cited by Biogen judicial notice was granted because no party objected to it. *See Mattera v. Biosurface Eng'g Techs., Inc.*, No. CV 13-08991-R, 2014 WL 12586482, at *1 (C.D. Cal. Feb. 5, 2014), (non-moving party submitted website information and moving party agreed that court should take judicial notice of it); *Weinstein v. Kirkman*, No. C13-076  9-JCC, 2013 WL 12121125, at *1 n.2 (W.D. Wash. Sept. 16, 2013) ("Plaintiff made no motion to strike or other objection to the Court's consideration of any of those documents."). Here, Ixchel does object to Biogen's submission of such evidence, and it should not be considered. And even if the Court were to consider this material, all it shows is that other companies are investigating other non-DMF drugs as possible treatments for multiple sclerosis. This does not establish that there are any significant competitors to Tecfidera, as Biogen suggests.

### D.    Ixchel's Asserted Causes of Action and Claims for Damages

Based on Biogen's conduct in disrupting Ixchel's business relationship with Forward and sabotaging Ixchel's attempt to bring its new DMF drug to market, Ixchel has asserted six different causes of action against Biogen for:

1.    Tortious interference with contract (Second Cause of Action);

2.    Intentional and/or negligent interference with prospective economic advantage (Third and Fourth Causes of Action);

3.    Sherman Act antitrust violation (First Cause of Action);

4.    California Cartwright Act violation (Fifth Cause of Action); and

5.    California unfair competition (Sixth Cause of Action).

(*See* FAC ¶¶ 38-78).

Ixchel alleges that, as a result of Biogen's conduct, it has been injured in several ways. First, Ixchel has suffered harm based on Forward's cancellation of the clinical trials for the new DMF drug that Forward was obligated to conduct and pay for under the Collaboration Agreement, but which

Forward now refuses to perform because of Biogen's interference. (*See id.* at ¶¶ 34, 35). And contrary to Biogen's assertion, Ixchel has in fact alleged that Forward's cancellation of these clinical trials constitutes a breach of the Collaboration Agreement. (*See id*. at ¶¶ 34, 35, 50).

Ixchel has also been significantly impaired in its ability to continue with developing, testing, obtaining FDA approval, and bringing to market the new DMF drug because of Biogen's interference. Ixchel currently lacks the funding and staffing to perform these activities on its own, and must now attempt to find another development partner to assist with this process. To date, Ixchel has been unable to find a new development partner for the new DMF drug. Biogen's unlawful and anticompetitive acts have therefore caused a significant delay in Ixchel's development and commercialization of the new DMF drug. (*Id.* at ¶ 35).

And finally, as a result of Forward's breach of the Collaboration Agreement and its termination of the agreement, Ixchel has also suffered harm in terms of lost revenue that Ixchel would have received from Forward under the royalty sharing provision of the Collaboration Agreement for sales of the new DMF drug. (*Id.* at ¶ 36).

## III.    LEGAL STANDARD

"A claim may be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (internal quotations and citations omitted). On a motion to dismiss, "all material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn from them." *Navarro*, 250 F.3d at 732. And "in antitrust cases, where the proof is largely in the hands of the alleged conspirators, . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) (internal quotations and citations omitted).

In addition, even if a court finds that a claim should be dismissed under Rule 12(b)(6), "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir.

1995)).  The purpose behind this policy is "to facilitate decision on the merits, rather than on the pleadings or technicalities."  *Id.* (internal quotations omitted).

## IV.   ARGUMENT

### A.   This Court Has Diversity Jurisdiction as Well as Pendent Jurisdiction Over Ixchel's State Law Claims

First, Biogen incorrectly argues for dismissal of Ixchel's state law claims under Fed. R. Civ. P. 12(b)(1) based on lack of subject matter jurisdiction.  Biogen essentially argues that, if the Court dismisses Ixchel's federal antitrust claim, then its state law claims must also be dismissed for lack of subject matter jurisdiction.  This argument fails for several reasons.

First, the Court should not dismiss Ixchel's federal antitrust claim for the reasons discussed in Section IV.D. below.  Second, even if the Court were to dismiss the federal claim, Biogen ignores that this Court has both diversity jurisdiction as well as pendent jurisdiction over Ixchel's state law claims.  As set forth in the FAC, in addition to pendent jurisdiction, "[t]his court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties are diverse in citizenship and the amount in controversy exceeds $75,000."  (FAC ¶ 5).  Specifically, Ixchel is a company incorporated and headquartered in California, while Biogen is a company incorporated in Delaware with its headquarters in Massachusetts.  (*See id.* at ¶¶ 1-2).  Thus, this case involves claims between citizens of different states.  *See* 28 U.S.C. § 1332(c).  In addition, Ixchel has properly pleaded that the amount in controversy in this action exceeds $75,000.  (*See id.* at ¶ 5).  This amount includes monetary losses to Ixchel such as the costs of the clinical trials that Forward agreed to pay for under the Collaboration Agreement but later refused to as a result of Biogen's interference, and the royalty payments that Ixchel would have received on sales of the DMF drug after FDA approval.  (*See id.* at ¶¶ 23-25, 34-36).

On a motion to dismiss, the Court "must accept the amount in controversy claimed by the plaintiff unless it can declare to a legal certainty that the case is worth less."  *Naffe v. Frey*, 789 F.3d 1030, 1040 (9th Cir. 2015).  Biogen cannot show to a "legal certainty" that the monetary harm that Ixchel has suffered is less than $75,000.  To the contrary, Biogen itself suggests that the costs of the clinical trials for which Ixchel is seeking compensation could be as high as over $800 million.  (*See* Dkt.

No. 20-1 at 6:22-23). Thus, Biogen cannot credibly argue for dismissal of Ixchel's state law claims under Rule 12(b)(1). Because there is diversity jurisdiction over Ixchel's state law claims, this Court cannot decline to exercise jurisdiction over them. *See BNSF Ry. Co. v. O'Dea*, 572 F.3d 785, 793 n.2 (9th Cir. 2009) (Fisher, J., concurring) ("the diversity statute . . . does not afford district courts the discretion to decline jurisdiction over state law claims.").

**B.**    **Ixchel Has Properly Pleaded a Claim for Tortious Interference with Contract**

Ixchel has properly pleaded a state law claim for tortious interference with contract (the second cause of action in the FAC), and Biogen's argument to the contrary is based on its misunderstanding of the law. Biogen incorrectly states that, in order to state a claim for tortious interference with contract, Ixchel must plead that Biogen committed a wrongful act that is independent from interfering with the contract. But the case law holds exactly the opposite. As set forth by the California Supreme Court in *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26 (1998), the only elements that a plaintiff must plead to state a cause of action for intentional interference with contract are:

> (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

*Id.* at 55 (quotations and citations omitted).[2] Notably absent from this list is any requirement of an independently wrongful act.

Indeed, in *Quelimane* the court explained the difference between a claim for tortious interference with contract and tortious interference with prospective economic advantage – a difference that Biogen overlooks. Under *Quelimane*, a party alleging a claim of tortious interference with contract does ***not*** need to allege a separate wrongful act in order to plead a claim of tortious interference with contract because interfering with a contract is itself a wrongful act:

> [I]t is necessary to distinguish the tort of interference with an existing contract because the exchange of promises which cements an economic relationship as a contract is worthy of protection from a stranger to the contract. Intentionally inducing or causing a breach

---

[2] Ixchel has properly pleaded all five of these elements in the FAC. (*See* FAC ¶¶ 22, 31-36, 48-52).

of an existing contract is therefore a wrong in and of itself. Because this formal economic relationship does not exist and damages are speculative when remedies are sought for interference in what is only prospective economic advantage, *Della Penna* concluded that some wrongfulness apart from the impact of the defendant's conduct on that prospect should be required. Implicit in the *Della Penna* holding is a conclusion that ***this additional aspect of wrongfulness is <u>not</u> an element of the tort of intentional interference with an existing contract***.

*Id.* at 55-56 (emphasis added). Importantly, this distinction was subsequently affirmed by the very case that Biogen cites in its motion, *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003). *See id.* at 1158 ("As we have made clear in both *Della Penna* and *Quelimane*, the distinction between these two torts [tortious interference with contract and tortious interference with prospective economic advantage] is found in the independent wrongfulness requirement of the tort of interference with prospective economic advantage.").

In the present case, Ixchel has alleged that Biogen intentionally induced Forward to both ***breach and terminate*** the Collaboration Agreement. Specifically, as to the allegation of breach, Ixchel asserts that Biogen induced Forward to breach its obligation under the Collaboration Agreement to pay for and conduct clinical tests of the new DMF drug (an obligation which, importantly, survives any termination of the agreement).[3] (*See* FAC ¶¶ 23, 25, 34, 35). As to the allegation of termination, Ixchel asserts that Biogen induced Forward to terminate the Collaboration Agreement, thereby ending the entire contractual relationship between Ixchel and Forward. (*See id.* at ¶¶ 34-36). These allegations are sufficient to plead a claim for tortious interference with contract.[4] *See Quelimane*, 19 Cal. 4th at 55.

Biogen also incorrectly suggests that, because Forward had the right to terminate the contract at any time, there can be no claim for tortious interference with contract. Again, the case law holds exactly the opposite. Such an argument was squarely rejected in *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (1990). In that case, the plaintiff alleged that the defendant tortiously interfered

---

[3] Biogen incorrectly suggests that Forward could terminate the Collaboration Agreement at any time without any consequences. To the contrary, the agreement states that certain of Forward's obligations under the agreement – including the duty to pay for and conduct clinical trials that Ixchel alleges Forward failed to perform – survive termination. (*See* FAC ¶ 23).

[4] Even if Ixchel were required to plead an independently wrongful act to support its tortious interference with contract claim, it has met this requirement for the reasons explained in Section IV.C. below.

with the plaintiff's contract to purchase power from the Placer County Water Agency by inducing the Agency into terminating the contract. In its defense, the defendant argued, like Biogen, that it could not be liable for tortious interference with contract because the Agency had a legal right to terminate the contract. The California Supreme Court rejected this argument, holding that "it may be actionable to induce a party to a contract to terminate the contract according to its terms." *Id.* at 1126-27. The court explained that such a rule was necessary to protect parties to a contract against outside interlopers:

> Cases establishing a cause of action for interference with at-will and voidable contracts make it clear that it is the contractual relationship, not any term of the contract, which is protected against outside interference. We have affirmed that interference with an at-will contract is actionable interference with the contractual relationship, on the theory that a contract "at the will of the parties, respectively does not make it one at the will of others" . . . . Further, the expectation that the parties will honor the terms of the contract is protected against officious intermeddlers. . . . Nor do express termination provisions create a privilege to interfere . . . .

*Id.* at 1127-28 (internal quotations and citations omitted).

Thus, the fact that Forward had certain rights to terminate the Collaboration Agreement is not a defense to Ixchel's claim that Biogen tortiously interfered with the contract. Rather, Biogen's inducement of Forward to terminate the Collaboration Agreement is itself an act of interference that gives rise to a claim for tortious interference with contract.[5] *See id.* ("Despite the express termination clause, plaintiff was protected against unjustified interference by third parties."). The termination provision in the Collaboration Agreement also does not save Biogen from Ixchel's allegation that Biogen induced Forward to breach the non-terminable duty under the agreement to pay for and conduct the planned clinical trials.

Likewise, Biogen incorrectly asserts that Ixchel has failed to allege sufficient economic harm proximately caused by Biogen's conduct. To the contrary, Ixchel alleges in the complaint that the harm

---

[5] Biogen's reliance on *Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004), is misplaced. That case involved the question of what elements a plaintiff must prove in order to establish a claim under California law of "intentional interference with an at-will employment relation." *Id.* at 1152. There is no employment relationship involved in the present case, much less an at-will one. *Reeves* is therefore wholly inapposite. Indeed, California courts have subsequently noted the narrow applicability of *Reeves*. *See, e.g., Popescu v. Apple Inc.*, 1 Cal. App. 5th 39, 44-45 (2016) (plaintiff not required to allege independent wrongful conduct for a tortious interference with contract claim despite *Reeves* because *Reeves* is limited to "a claim by a former employer whose at-will employee was hired away by a new employer.").

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

15

it has suffered as a direct result of Biogen's interference includes: 1) the lost development costs for the clinical trials that Forward agreed to conduct but then later cancelled because of Biogen's interference, as well as 2) lost royalties that Ixchel would have been entitled to receive on sales of the new DMF drug upon FDA approval. (*See* FAC ¶¶ 23-25, 34-36). All of these are economic harms flowing proximately from Biogen's interference with the Collaboration Agreement.[6] And under California law, a plaintiff may recover both of these categories of damages where a party tortiously interferes with a drug development contract. For example, in *Asahi Kasei Pharma Corp. v. Actelion Ltd*., 222 Cal. App. 4th 945, 956-57 (2013), the court affirmed an award of roughly $19 million for lost development costs and $357 million in lost milestone and royalty payments as damages for tortious interference with drug development and licensing agreement.

The facts in *Asahi* were very similar to the present case. There, the plaintiff Japanese corporation, Asahi, entered into an agreement with a California biotech company, CoTherix, to develop and commercialize a drug, Fasudil, for the U.S. market. Under the terms of the agreement, CoTherix was responsible for obtaining regulatory approval to sell the drug in the U.S. and European markets, and to commercialize the drug in those markets. *See id.* at 952. Asahi's competitor, Actelion, however, subsequently acquired CoTherix and terminated the development agreement to prevent Fasudil from being sold in those markets. Asahi brought suit against Actelion, and at trial the jury found that Actelion's conduct constituted an intentional interference with contract – a finding that was affirmed on appeal, along with the damages award that included lost development costs and lost royalty payments for the drug that was never sold because of the defendant's interference. *See id.* at 957, 976.

Here, Ixchel stands in the same position as the plaintiff in *Asahi*. Just like Asahi, Ixchel entered into a joint development contract with another biotech company that was disrupted when an intermeddling company engaged in deliberate acts to cause the termination of the contract. And just like Asahi, Ixchel has suffered damages in the form of lost development costs and lost royalty payments

---

[6] Moreover, "economic harm proximately caused by the defendant's action" is not an essential element of a claim for tortious interference with contract. *See Quelimane,* 19 Cal. 4th at 55. Biogen incorrectly quotes this language from *Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc*., 2 Cal. 5th 505, 512 (2017), a case that involved a claim of tortious interference with prospective economic advantage, ***not*** tortious interference with contract.

because of its inability to bring its new drug to the market because of the defendant's interference. Thus, just as the court in *Asahi* affirmed that the plaintiff had a meritorious tortious interference with contract claim, so does Ixchel here.

Furthermore, to the extent Biogen disputes whether the harm Ixchel suffered is sufficiently proximate to Biogen's alleged acts of interference, that argument goes to the substantive merits of Ixchel's damages claim and is not a proper basis for dismissal at the pleading stage. *See Swenson v. National R.R. Passenger Corp.*, No. 2:14-cv-02629-KJM-CMK, 2016 WL 4160785, at *3 (E.D. Cal. Aug. 5, 2016) ("Factual questions regarding proximate cause generally must be decided at the summary judgment stage or at trial, not on a motion to dismiss."); *Asahi*, 222 Cal. App. 4th at 971 ("There is no rule prohibiting recovery of lost profits damages simply because regulatory approval is a prerequisite to selling a product.").

Additionally, the court in *Pacific Gas & Electric* specifically held that "interference with the plaintiff's performance may give rise to a claim for interference with contractual relations if plaintiff's performance is made more costly or more burdensome." 50 Cal. 3d at 1129. Thus, the allegation in the FAC that Ixchel's work in developing the new DMF drug has been significantly delayed and made more expensive because of Biogen's interference is also a cognizable harm sufficient to support the tortious interference claim. (*See* FAC ¶ 35).

Finally, Biogen incorrectly argues that the FAC is deficient because it only alleges in conclusory fashion that Biogen acted with the intent to interfere with the Collaboration Agreement. Under Federal Rule of Civil Procedure 9(b), at the pleading stage intent may be alleged generally. *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *Taheny v. Wells Fargo Banks, N.A.*, No. S-10-2123 LKK/EFB, 2011 WL 1466944, at *4 (E.D. Cal. Apr. 18, 2011) ("In this circuit, plaintiffs need not plead 'any particularity in connection with an averment of intent, knowledge or condition of the mind.'") (quoting *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir. 1994)).

And in any event, there are ample factual allegations in the FAC to support that Biogen acted with the requisite intent. Intent to interfere can be inferred from a defendant's intentional performance

of an act that is "substantially certain" to interfere with the contract. *See Savage v. Pacific Gas & Elec. Co.*, 21 Cal. App. 4th 434, 449 (1993). The FAC alleges (and Biogen does not dispute) that Biogen intentionally executed an agreement with Forward that required Forward to cease all collaborative work as well as any contracts with Ixchel. (*See* FAC ¶¶ 31-32). Biogen's inclusion of this provision in its agreement with Forward was substantially certain to interfere with the Collaboration Agreement. Indeed, even Biogen admits that it purposely interfered with the Collaboration Agreement to protect its own economic interests. (*See* Biogen Mot. at 1:14-16) (Biogen required Forward to terminate the Collaboration Agreement "[t]o protect the value of the license Biogen received."). Thus, the factual allegations in the FAC are more than sufficient to support that Biogen had the requisite intent for Ixchel's tortious interference with contract claim.

## C. Ixchel Has Properly Pleaded Claims for Intentional and Negligent Interference with Prospective Economic Advantage

Ixchel has also properly pleaded state law claims for intentional and negligent interference with prospective economic advantage (the third and fourth causes of action in the FAC). For these particular claims, Biogen is correct that a plaintiff must plead and prove that the defendant's interference "was wrongful by some measure beyond the fact of the interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392-93 (1995). In this regard, the plaintiff "can satisfy the wrongfulness requirement by showing that the defendant's conduct violates a statute, regulation, or recognized common rule of law." *Sebastian Int'l, Inc. v. Russolillo*, 128 F. Supp. 2d 630, 637 (C.D. Cal. 2001). Biogen incorrectly asserts, however, that the only wrongful conduct that Ixchel alleges Biogen engaged in (aside from the interference) is viewing confidential information in the Collaboration Agreement. As discussed below (and as pleaded in the FAC), Ixchel also alleges that Biogen's conduct violates the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law ("UCL"). These allegations satisfy the requirement of an independently wrongful act to support an interference with prospective economic advantage claim. *See CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1110 (9th Cir. 2007) (interference with prospective economic advantage claim supported by allegation that defendant violated UCL); *Solyndra Residual Trust v.*

*Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1047 (N.D. Cal. 2014) (interference with prospective economic advantage claim supported by allegation that defendant violated Sherman Act and Cartwright Act).

In addition, with respect to Ixchel's negligent interference with prospective economic advantage claim, Biogen incorrectly asserts that it had no duty of care to Ixchel. A duty of care "may be premised upon the general character of the activity in which the defendant engaged, the relationship between the parties or even the interdependent nature of human society." *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803 (1979). Whether a duty of care exists for a negligent interference with prospective economic advantage claim depends on the following factors:

> (1) [T]he extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm.

*Id.* at 804. Here, each of these factors weighs in favor of a duty of care. Biogen's conduct was intended to affect Ixchel, as Section 2.13 of the Forward-Biogen agreement specifically required Forward to terminate its business relationship with Ixchel. And Forward's termination of that relationship as a result of Section 2.13 was reasonable foreseeable. In addition, Ixchel suffered certain injury that was closely connected to Biogen's conduct, for the reasons discussed above. Finally, Biogen's conduct is morally wrong because Biogen acted with full knowledge that its actions would disrupt Ixchel's relationship with Forward and cause financial harm to Ixchel, and there are strong policy reasons why such conduct should not be permitted. *See Pacific Gas*, 50 Cal. 3d at 1128 ("the expectation that the parties will honor the terms of the contract is protected against officious intermeddlers."). The factual allegations in the FAC therefore support that Biogen owed a duty of care to Ixchel.

### D. Ixchel Has Properly Pleaded a Sherman Act Antitrust Claim

Ixchel has also properly pleaded a Sherman Act antitrust violation (the first cause of action in the FAC). Contrary to Biogen's argument, the harm Ixchel has suffered as a result of Biogen's conduct is both an Article III and antitrust injury, and Ixchel has the necessary standing to bring its federal antitrust

claim. In addition, the allegations in Ixchel's complaint are more than sufficient to raise a cognizable

antitrust claim under either a *per se* analysis or under the Rule of Reason.

**1.    Ixchel Has Suffered an Article III Injury in Fact**

First, Biogen incorrectly argues that Ixchel's alleged injuries from Biogen's anticompetitive

actions are too speculative and too indirect. To the contrary, Ixchel's injuries are a direct consequence

of Biogen's contractual agreement with Forward to exclude Ixchel from the market, and are readily

calculable. Biogen's arguments are based on the false assumption that Ixchel's damages theory rests

entirely on lost royalties that it would have received had it succeeded in obtaining FDA approval for its

new DMF drug. But lost royalties are just one part of Ixchel's claim for damages. As discussed above,

Ixchel also seeks damages for lost development costs, including the costs of the clinical trials that

Forward agreed to conduct but then later cancelled because of Biogen's interference.

As alleged in the FAC, because Section 2.13 of the Forward-Biogen agreement required Forward

to immediately cease all work with Ixchel, Forward now refuses to perform its contractual obligation to

pay for and conduct clinical trials for Ixchel's experimental DMF drug. (*See* FAC ¶ 34). At the time

Forward terminated its relationship with Ixchel, however, the parties had already put together a plan for

the clinical trials, which included parameters as to the number of patients and the experimental design.

(*See id.* at ¶ 25). The costs of this clinical trial are not speculative. Rather, those costs are well within

the realm of calculation based on documentary and other evidence that Ixchel intends to present at trial

regarding the clinical trial design. Nor is this injury a hypothetical harm that may or may not occur at

some point in the future. Rather, Ixchel has already suffered an injury in fact in the form of lost

development costs.

The fact that Ixchel has already suffered an actual injury as a result of Biogen's conduct

distinguishes the present case from *Space Exploration Technologies Corp. v. Boeing Co*., No. 05-07533

FMC (MANx), 2006 WL 7136649 (C.D. Cal. May 12, 2006), cited by Biogen. In *Space Exploration*,

the plaintiff's antitrust claim was dismissed for lack of standing because the plaintiff could not point to

any contractual opportunity that it actually lost or was excluded from competing for as a result of the

alleged anticompetitive conduct. *See id.* at *5. By contrast, Ixchel has already been injured because Biogen has induced Forward's cancellation of the planned clinical trial.

Likewise, Ixchel's damages claim for lost royalties is not speculative, but can be estimated based on evidence such as forecasting documents prepared by Ixchel and Forward and expert testimony that Ixchel intends to present at trial. The fact that Ixchel's new DMF drug still needed to pass through the FDA approval process does not make Ixchel's lost royalties claim speculative. "There is no rule prohibiting recovery of lost profits damages simply because regulatory approval is a prerequisite to selling a product." *Asahi*, 222 Cal. App. 4th at 971. Rather, "it is for the jury to determine the probabilities as to whether damages are reasonably certain to occur in any particular case." *Id.* at 972.

Moreover, Biogen cannot be heard to complain about the speculativeness of Ixchel's damages when those damages are a direct result of Biogen's alleged anticompetitive conduct. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."); *see also World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1478 (10th Cir. 1985) ("If proof of a profit and loss history were required, no plaintiff could ever recover for losses resulting from his inability to enter a market. However, such recoveries are clearly available under section 4 of the Clayton Act."). Thus, to the extent Biogen intends to attack Ixchel's evidence of lost royalties as too speculative, that is a factual dispute that should be resolved by the trier of fact, not at the pleading stage. *See Los Angeles Mem'l Coliseum Comm'n v. National Football League*, 791 F.3d 1356, 1360 (9th Cir. 1986) ("In antitrust cases, a lesser level of proof is needed to support the amount of damages than to support the fact of antitrust injury; in applying this 'liberal proof of damages standard,' we have required only that the plaintiff provide sufficient evidence to permit a 'just and reasonable estimate of the damages.'").

Biogen also incorrectly argues that Forward's recent announcement that it has suspended any further drug development work pending the outcome of certain legal proceedings between Biogen and Forward somehow breaks the causal link between Biogen's alleged conduct and Ixchel's asserted harm. First, Forward's statement to the public as to why it decided to stop any further drug development work

is largely irrelevant and should not be accepted as true. Indeed, as discussed above, the real reason Forward has ceased all drug development work with respect to any DMF-based drugs is because Section 2.13 of the Forward-Biogen agreement effectively prevents Forward from engaging in any drug development work in that space.

In addition, Forward's public statement is entirely consistent with the fact that the amount of Forward's compensation under the Forward-Biogen agreement is dependent on the ultimate outcome of the legal proceedings between the parties. (*See* Tsai Decl., Ex. A at 30-32). Viewed in this context, Forward's statement shows that its actions are directly tied to the anticompetitive agreement that it struck with Biogen. Specifically, it makes eminent sense that Forward would temporarily halt its own drug development work to see how much it is going to get paid by Biogen for staying out of the DMF market. This is not a decision that Forward made independently of Biogen's anticompetitive conduct, but rather as a direct consequence of it. Thus, there is no causal disconnect here, as Biogen suggests.

### 2. Ixchel Has Antitrust Standing

#### a) Biogen Fails to Apply the Correct Five-Factor Test for Antitrust Standing

Biogen also incorrectly argues that Ixchel lacks standing to assert an antitrust claim against Biogen. First, Biogen fails to apply the correct test for antitrust standing. To determine whether a plaintiff has standing to assert an antitrust claim, the court must consider the following five factors:

(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall;

(2) the directness of the injury;

(3) the speculative measure of the harm;

(4) the risk of duplicative recovery; and

(5) the complexity in apportioning damages.

*American Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1054 (9th Cir. 1999). "To conclude that there is antitrust standing, a court need not find in favor of the plaintiff on each factor." *Id.* at 1055. Instead, courts are to balance all five factors. *See id.*

Here, all five factors weigh in favor of finding that Ixchel has antitrust standing.  On the first factor of the nature of the plaintiff's alleged injury, Ixchel alleges that it has been unfairly excluded from competing in the market for DMF drugs for the treatment of neurological diseases because of Biogen's collusion with Forward to stop Ixchel from developing its new DMF drug for that market.  The harm that Ixchel has suffered is therefore exactly the type of injury that the antitrust laws were intended to forestall.  *See Retrophin, Inc. v. Questcor Pharms., Inc.*, 41 F. Supp. 3d 906, 913-14 (C.D. Cal. 2014) ("Retrophin's injury – exclusion from the Relevant Markets – is inseparable from the alleged harm to competition.  Accordingly, the Court finds that Retrophin sufficiently alleges antitrust injury."); *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 466 F.3d 961, 967-68 (11th Cir. 2006) (plaintiff's allegation of exclusion from the relevant market is "injury of the type against which the antitrust laws are designed to protect.").

As to the second factor, the injury Ixchel has suffered is directly linked to Biogen's anticompetitive conduct.  Specifically, the agreement that Biogen entered into with Forward specifically required Forward to terminate all business ties with Ixchel, and it is because of this agreement that Forward terminated its relationship with Ixchel.  Biogen's anticompetitive conduct is therefore the direct cause of the harm to Ixchel.  *See American Ad*, 190 F.3d at 1058 (directness of injury focuses on the "chain of causation" between the alleged injury and the alleged restraint in the market).

On the third factor, the harm to Ixchel is not speculative, for the reasons already discussed above – namely, Ixchel has already suffered an actual injury in the form of lost development costs, and its lost royalty damages are reasonably calculable.  As to the fourth factor, there is no risk of duplicative recovery because Ixchel is the only party to have suffered the alleged damages of the lost development costs and lost royalty payments.  Thus, there are no other potential plaintiffs who may seek to recover from Biogen.  *See id.* at 1059 ("The risk to be avoided under [the duplicative recovery factor] is that potential plaintiffs may be in a position to assert conflicting claims to a common fund . . . thereby creating the danger of multiple liability for the fund.") (internal quotations omitted).  And on the fifth factor, there is no complex damages apportionment issue as the damages in this case do not need to be apportioned between multiple victims of Biogen's anticompetitive conduct.

1   In sum, all five factors relevant to the antitrust standing inquiry favor a finding that Ixchel has

2   the necessary standing to pursue its antitrust claim against Biogen.  Importantly, Biogen does not even

3   address three of these five factors (*i.e.*, the directness of the injury, the risk of duplicative recovery, and

4   the complexity of apportioning damages).  Instead, Biogen focuses its arguments on challenging the

5   nature of the alleged injury and the speculative measure of the harm.  But none of Biogen's arguments

6   on these two factors are persuasive.

### b)   Ixchel's Damages Are Not Speculative

8   First, Biogen's assertion that the harm suffered by Ixchel is too speculative lacks merit, for the

9   reasons already discussed above – namely, Ixchel has already suffered actual damages in the form of

10  lost development costs, and its claim for lost royalties is reasonably calculable.  Moreover, the fact that

11  Ixchel's experimental drug has yet to pass through the FDA approval process does not make Ixchel's

12  claim speculative.  Other courts have granted antitrust standing to pharmaceutical companies with drugs

13  that are still in development – especially where, as here, the alleged anticompetitive conduct is

14  preventing the plaintiff from obtaining the necessary FDA approval.  *See, e.g., Bristol-Myers Squibb Co.*

15  *v. Ben Venue Labs.*, 90 F. Supp. 2d 540, 545 (D.N.J. 2000) ("For Bristol to insist that its generic

16  competitors have no standing because they are not in the market, when Bristol itself foreclosed their

17  access to it, is meritless."); *Amgen Inc. v. Hoffman-La Roche Ltd.*, 480 F. Supp. 2d 462, 467 (D. Mass.

18  2007) ("[t]his Court has previously held that a potential competitor does not lack antitrust standing

19  merely because it is not yet in the market."); *Retrophin*, 41 F. Supp. 3d at 915 ("the necessity of FDA

20  approval under these circumstances does not render the alleged harm too speculative").

### c)   Ixchel Is an Active Participant in the DMF Drug Market

22  Second, Biogen erroneously asserts that Ixchel lacks standing because it was not a participant in

23  the restrained market of drugs containing DMF as an API for the treatment of neurological diseases.  As

24  an initial matter, Biogen incorrectly suggests that only competitors or consumers in the allegedly

25  restrained market have standing to bring an antitrust claim.  The Ninth Circuit has squarely rejected this

26  view, noting that "courts routinely recognize the antitrust claims of market participants other than

27  consumers or competitors."  *American Ad*, 190 F.3d at 1057.  As the Ninth Circuit has explained, "it is

not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *Id.* at 1058. Here, the relationship between Biogen's alleged unlawful conduct and the alleged harm to Ixchel could not be more direct. Biogen's anticompetitive agreement with Forward ***specifically names Ixchel*** as the company Biogen wished to exclude from the marketplace. Given that it was the explicit target of Biogen's anticompetitive conduct, Ixchel should certainly have standing to seek relief for the harm it has suffered because of Biogen's misconduct.

Biogen also incorrectly asserts that Ixchel stood as merely a licensor or supplier to Forward, rather than an actual participant in the restrained market of drugs containing DMF as an API for the treatment of neurological diseases. As alleged in the FAC, Ixchel was not a mere "licensor" or "supplier" to Forward. Rather, Ixchel was an active business partner in the joint venture with Forward to develop and commercialize the new DMF drug. Ixchel was the party who filed for and received the Orphan Drug Designation for the new DMF drug. (*See* FAC ¶ 10). As set forth in the terms of the Collaboration Agreement, Ixchel was to perform a critical role assisting in the clinical trial phase of the development process for the new DMF drug. (*See id.* at ¶ 23). Under the Collaboration Agreement, Ixchel was also to provide assistance to Forward with the manufacturing and commercialization process for the new drug. (*See id.* at ¶ 24). And under the Collaboration Agreement, Ixchel retained the right to commercialize the new DMF drug for certain uses independently of Forward. (*See id.*). Thus, Biogen's claim that Ixchel was nothing more than a passive licensor or supplier rather than an active participant in the market is baseless.

The cases cited by Biogen do not support its position. In *Ethypharm S.A. France v. Abbott Labs*, 707 F.3d 223 (3d Cir. 2013), a French pharmaceutical company, Ethypharm, developed a drug called fenofibrate but deliberately chose not to obtain FDA approval to sell the drug in the United States. Instead, the company chose to license a U.S. company, Reliant, who would be responsible for obtaining the necessary FDA approval of the drug and distributing it in the United States. *See id.* at 226. The court held that, because of Ethypharm's decision not to seek FDA approval so that it could enter the U.S. market, it could not argue that it was a competitor in the U.S. market for purposes of antitrust

standing.  *See id.* at 236.  By contrast, here Ixchel is not avoiding the FDA regulatory process.  Quite the opposite – Ixchel has partnered up with another company, Forward, to jointly obtain FDA approval for its new DMF drug so that the parties can jointly commercialize their product.  The court's rationale in *Ethypharm* therefore does not apply to the present case.

*SigmaPharm, Inc. v. Mutual Pharm. Co.*, 772 F. Supp. 2d 660 (E.D. Pa. 2011), is also inapposite.  In that case, the plaintiff alleged anticompetitive conduct in the market for generic equivalents of the drug SKELAXIN.  The plaintiff, however, was neither a potential nor actual competitor in that market.  Rather, the plaintiff simply licensed its technology to another company who was in that market, and the plaintiff was contractually entitled to receive royalties on the other company's sales of products in the market.  The court found that the plaintiff lacked antitrust standing due to the fact that the plaintiff was neither a potential nor actual competitor in the restrained market.  *See id.* at 673-74.  By contrast, in the present case Ixchel is at the very least a potential competitor to Biogen in the relevant market, as it has taken affirmative steps to develop a drug product for that market.  Ixchel therefore stands in a very different position than the plaintiff in *SigmaPharm*.

Indeed, Biogen's argument appears to be premised on the idea that, because Ixchel admits that it could not bring the new DMF drug to market by itself, then it must not have been a potential competitor.  But this is not how one defines a potential competitor.  Just because Ixchel needed to enter into contracts with other companies to help bring its new DMF drug to market does not mean Ixchel was not a potential competitor to Biogen.  If that were the standard, then no party would ever be a potential competitor, because there are few if any companies in the world who have the means to bring a new product to market without any assistance from any third parties whatsoever.

Moreover, Biogen's suggestion that Ixchel was not a competitive threat to its business is belied by the fact that Biogen specifically targeted Ixchel for exclusion from the market when it required Forward to contractually agree never to have any further dealings with Ixchel.  If Ixchel truly was not any threat to Biogen's business, then that begs the question of why Biogen demanded that Forward cut all ties with Ixchel and its CEO as part of the Biogen-Forward agreement.

The other cases that Biogen cites are also inapposite. In *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139 (9th Cir. 1986), the plaintiff alleged that the defendant was illegally restraining the markets for steam and steam rights but was found to lack standing because its only relationship to those markets was the fact that it rented property to the defendant steam company. *See id.* at 148. By contrast, Ixchel is an active participant in the market in which Biogen has attempted to stifle competition.

And in *Brian Clewer, Inc. v. Pan Am. World Airways, Inc.*, 674 F. Supp. 782 (C.D. Cal. 1986), the plaintiff, a travel agency, asserted that the defendant airline companies had engaged in anticompetitive acts against a competitor, Laker Airways, in the air transportation market. The plaintiff argued that it was injured by the defendant's acts because it lost commissions on sales of tickets on Laker flights. The court held that this injury was too indirect to support standing, as Laker was the true target of the alleged antitrust conspiracy and the plaintiff's alleged harm was merely derivative of the harm suffered by Laker. *See id.* at 787. The court also found standing to be lacking because there were already other parties more directly injured by the defendant (including Laker itself, Laker passengers, and Laker employees) who had brought similar antitrust claims against the defendants. *See id.* at 787-8. The plaintiff's claim would therefore have created a risk of duplicative recovery. *See id.* at 788. By contrast, Ixchel is the party who has been most directly harmed by Biogen's anticompetitive conduct, and no other entity has asserted a claim against Biogen for the same or similar conduct, creating no risk of duplicative recovery.

Likewise, Biogen's reliance on *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, No. 08-4168 (MLC), 2010 WL 3172187 (D.N.J. Aug. 10, 2010), is misplaced. In that case, the court found that the plaintiff did have standing to assert an antitrust claim against a competing pharmaceutical company. *See id.* at *6. Moreover, the statement by the court regarding "fewer or nonexistent royalties" under a licensing agreement not being a sufficient basis for an antitrust claim is inapplicable to the present situation. As discussed, the harm suffered by Ixchel is not merely lost royalties, but also the lost development costs that it has already suffered as a result of Biogen's anticompetitive acts.

Biogen also incorrectly argues that Ixchel merely acted as a consultant to Forward, and that as a consultant Ixchel lacks standing to assert its antitrust claim against Biogen. But Ixchel was not a mere consultant to Forward. As alleged in the FAC, Ixchel was part of a joint venture with Forward to develop and market the new DMF drug. (*See* FAC ¶¶ 22-24). Ixchel is not in the business of providing consulting services. Rather, Ixchel is in the business of developing small-molecule drugs to treat diseases. (*See id.* at ¶¶ 1, 10). That is why Ixchel applied for and received an Orphan Drug Designation for the use of DMF to treat Friedreich's ataxia, and why it entered into an agreement with Forward under which Ixchel agreed to work with Forward to develop the new DMF drug. (*See id.* at ¶¶ 10, 22-24). The cases cited by Biogen holding that consultants are in a different market than the customers to whom they provide their services are therefore inapposite.[7]

Further, as Biogen recognizes, the Supreme Court in *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), held that injuries that are "inextricably intertwined" with the injury that an antitrust defendant seeks to inflict in another market are sufficient to confer antitrust standing. *See id.* at 484. As the Supreme Court held in *McCready*, where a party has suffered an injury that was "a necessary step in effecting the ends of the alleged illegal conspiracy," the party has antitrust standing even if it is not considered a participant in the market. *Id.* at 479 (quotations omitted). Likewise, the Ninth Circuit has recognized that a party that is neither a competitor nor a consumer in the restrained market can nevertheless have antitrust standing where the harm the party suffered "was a necessary means to achieve the conspirators' illegal end as well as an integral and inextricable part of the anticompetitive scheme." *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 746 (9th Cir. 1984). In other words, "[b]oth *McCready* and *Ostrofe*, therefore, stand for the proposition that antitrust injury can be satisfied when a

---

[7] Indeed, in the cases cited by Biogen, the plaintiff did not even attempt to argue that it was anything other than a mere consultant to the party directly harmed by the anticompetitive conduct. *See, e.g., Legal Econ. Evaluations, Inc. v. Metro. Life Ins.*, 39 F.3d 951, 952 (9th Cir. 1994) (undisputed that plaintiffs were in the business of acting as structured settlement consultants to tort plaintiffs); *Cargill Inc. v. Budine*, No. CV-F-07-349-LJO-SMS, 2007 WL 2506451, at *5 (E.D. Cal. Aug. 30, 2007) ("In a passing opposition on this point, Progressive argues that it is only required to *plead* antitrust injury, without further establishing that it is participant in the alleged relevant market."); *AFMS, LLC v. United Parcel Serv. Co.*, No. 10-05830 MMM (RCx), 2011 WL 13135632, at *8 (C.D. Cal. May 27, 2011) (plaintiff admitted that it merely acted as a provider of consulting services to clients).

plaintiff is the direct victim of a conspiracy, or the actual means by which the defendants' allegedly anticompetitive conduct is carried out." *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 536 F. Supp. 2d 1129, 1139-40 (N.D. Cal. 2008). *See also Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1300-01 (S.D. Cal. 2009) (party who is not market participant can still have antitrust standing where the party "can be considered the 'direct victim' of a conspiracy or the 'necessary means' by which the conspiracy was carried out.").

Here, Biogen cannot credibly dispute that Ixchel was the direct victim of its anticompetitive conduct. The specific terms of Biogen's contract with Forward required Forward to "terminate any and all existing, and not enter into any new, Contracts or obligations to Ixchel Pharma LLC . . . ." (FAC ¶ 32). Thus, Biogen explicitly targeted Ixchel for exclusion from the DMF market. As a direct victim of Biogen's anticompetitive conduct, Ixchel has antitrust standing under the rationale in *McCready* and *Ostrofe*. In response, Biogen argues that Ixchel lacks standing because harming Ixchel was not "essential to inflicting competitive harm." (Biogen Mot. at 19:12-15). But not only is this pure conjecture, it also misses the point entirely. The fact that Ixchel was the direct victim of Biogen's anticompetitive conduct establishes Ixchel's antitrust standing, regardless of whether Biogen's exclusionary conduct toward Ixchel was "essential to inflicting competitive harm."[8]

### d) Ixchel Had the Necessary Intent and Preparedness to Enter the DMF Drug Market

As Biogen recognizes, a party who has not yet entered a particular market can still have standing to assert a claim for an antitrust violation in that market if the party shows that it has "a genuine intent to enter the market and a preparedness to do so." *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir. 1985). Factors relevant to this determination include: "(1) the plaintiff's background and experience in the prospective business, (2) "affirmative action on the part of the plaintiff to engage in the proposed business," (3) the plaintiff's ability to finance entry, and (4) consummation of contracts." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1465 (9th Cir. 1993) (alterations and

---

[8] Biogen's reliance on *Exhibitors' Serv., Inc. v. American Multi-Cinema, Inc.*, 788 F.2d 574 (9th Cir. 1986), is misplaced. In that case, the court found that the plaintiff licensing agent was not a direct victim of the alleged anticompetitive conduct, but rather the plaintiff's "injury . . . was merely indirect and derivative" of the harm caused to film distributors. *See id.* at 579.

internal quotations omitted). On these four factors, the FAC contains sufficient factual allegations which, accepted as true as they must be at the pleading stage, establish that Ixchel has the requisite intent and preparedness for antitrust standing.

As an initial matter, Biogen's assertion that Ixchel never intended to market a product itself is baseless. As discussed, Ixchel's arrangement with Forward was that Ixchel would fully participate in all aspects of the development, manufacturing, and commercialization process of the new DMF drug, but with Forward providing the bulk of the resources for those efforts given its greater financial resources. Moreover, Biogen incorrectly suggests that the four-factor test relates only to the plaintiff's preparedness to enter the market, and not the plaintiff's intent. To the contrary, courts have clearly explained that the four-factor test is used to determine "whether a potential competitor has shown the necessary intention and preparedness to enter the market," and thus there is no separate test for intent. *See Tawfilis v. Allergan, Inc*., 157 F. Supp. 3d 853, 866 (C.D. Cal. 2015).

### *Factor 1: Ixchel Has the Necessary Background and Experience in the Prospective Business*

As alleged in the FAC, Ixchel's CEO is an experienced researcher with several decades of experience studying the treatment of neurological diseases like Friedriech's ataxia. (*See* FAC ¶ 9). Ixchel also has on its Advisory Board two experienced executives with several decades of experience in developing new drugs, securing FDA approval for new drugs, and managing the manufacturing and commercialization of new drugs. (*See id.* at ¶ 12). Thus, Ixchel has the necessary background and experience in the prospective business.

In response, Biogen argues that neither Ixchel nor Forward has ever commercialized a drug in the United States or elsewhere, which misses the point. As discussed, Ixchel has personnel with the relevant experience in commercializing drug products, which is sufficient to show that Ixchel has the necessary background and experience. Moreover, there is no requirement that Ixchel specifically allege any expertise in drug commercialization to survive a motion to dismiss. *See Retrophin*, 41 F. Supp. 3d at 915 (allegation that plaintiff had "expertise as a biopharmaceutical company focusing on rare diseases" was sufficient to show background and experience of plaintiff to support intent and preparedness to enter market).

***Factor 2: Ixchel Has Taken Affirmative Steps to Engage in the Proposed Business***

To develop its new DMF drug, Ixchel took various affirmative steps, including developing patent-pending technology relating to DMF therapies, obtaining an Orphan Drug Designation to facilitate development of its new drug, conducting pre-clinical studies for the new drug, securing Forward as a partner to help in the development and commercialization of the product, and entering into a Collaboration Agreement with Forward.  (*See* FAC ¶¶ 10, 22-26).  Ixchel was also engaged in setting up clinical trials for the new DMF drug with Forward at the time Biogen interfered with Ixchel's relationship with Forward.  (*See id.* at ¶ 25).  Thus, Ixchel has shown affirmative action to engage in the proposed business.

In response, Biogen incorrectly argues that Ixchel has not alleged any concrete plan for manufacturing or commercializing the new DMF drug.  To the contrary, Ixchel has alleged that as part of the Collaboration Agreement it had secured Forward's commitment to take the lead on the manufacturing and commercialization steps of the process.  (*See id.* at ¶ 24).  Moreover, simply because Ixchel had not completely mapped out every single detail of its development and commercialization process for the new DMF drug does not mean it lacked the intent and preparedness to enter the market.  In *Retrophin*, for example, the court found that the plaintiff biopharmaceutical company had sufficiently alleged an intent and preparedness to enter the market without any allegation as to any concrete plan for manufacturing the product.  *See Retrophin*, 41 F. Supp. 3d at 915.

Biogen also incorrectly argues that the FAC does not contain sufficient allegations that FDA approval is likely.  In *Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.*, No. 03-232, 2004 WL 1427136 (E.D. Pa. June 21, 2004), there was no allegation by the plaintiff as to the probability of FDA approval of the drug.  *See id.* at *6.  By contrast, here the FAC alleges that "[t]he new DMF drug has a good probability of being approved by the FDA for the treatment of Friedreich's ataxia," given that DMF has already been proven to be safe for use in humans, and pre-clinical studies already show that DMF is a promising drug for treating Friedreich's ataxia.  (FAC ¶ 26).  Such allegations are sufficient to support Ixchel's intent and preparedness to enter the market.  *See Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 808 (D.C. Cir. 2001) ("Biovail could have alleged its intent and preparedness to

enter the market by claiming that FDA approval was probable."); *Eon Labs., Inc. v. Smithkline Beecham Corp.*, 298 F. Supp. 2d 175, 182 (D. Mass. 2003) ("Although Eon had not yet received FDA approval of its application in early 1998, it nevertheless could have asserted a valid antitrust claim based on the claim that 'FDA approval was probable.'"); *BNLfood Investments Ltd. SARL v. Martek Biosciences Corp.*, No. WDQ-11-0446, 2011 WL 6439451, at *4 (D. Md. Dec. 14, 2011) ("alleging mere anticipation of FDA approval may indicate preparedness to enter a market").

### *Factor 3: Ixchel Had the Ability to Finance Entry into the Market*

Further, through its contract with Forward, Ixchel obtained the necessary financing for bringing the new DMF drug to market. That contract required Forward to pay for all the development and commercialization costs of the project ensured that Ixchel would have a realistic means for bringing the drug to market. (*See id.* at ¶¶ 23, 24). Indeed, given the estimated $700-800 million market capitalization of Forward just prior to Biogen's anticompetitive conduct, it can reasonably be assumed that Ixchel and Forward had ample financial means to actually bring the new DMF drug to market. (*See id.* at ¶ 13).

Biogen incorrectly argues that Forward's ability to finance the joint venture to develop the new DMF drug does not count in the analysis. The intent and preparedness analysis focuses on the ability of the competitor to enter the market, and here, prior to Biogen's anticompetitive acts the competitor to Biogen was the combination of Ixchel and Forward working together. (*See* FAC ¶ 28). Forward's financing of the joint venture is therefore entirely relevant to the analysis. *See Tawfilis*, 157 F. Supp. 3d at 866. And Biogen's assertion that Forward had independent reasons for not proceeding with the financing of the project lacks merit. As discussed, Forward's actions after its termination of its contract with Ixchel are a direct consequence of Biogen's anticompetitive interference with the contract, and therefore cannot be considered independent reasons why the joint venture would not have succeeded.

### *Factor 4: Ixchel Had Consummated the Necessary Contracts to Enter the Market*

Finally, Ixchel's contract with Forward further supports that Ixchel was prepared to enter the market. The Collaboration Agreement established a business relationship between two parties that, with their combined resources, had both the scientific expertise as well as financial resources necessary to

successfully take a drug from the developmental stages all the way to commercialization.  And, pursuant to this agreement, Ixchel and Forward had already started to plan out the clinical trials necessary to obtain FDA approval of the new DMF drug.

Biogen suggests that more detailed contracts with respect to testing or manufacturing are required, but the case law shows to the contrary.  For example, in *Retrophin*, the court found that the plaintiff had the necessary intent and preparedness to enter the market despite the fact that the plaintiff had not yet consummated a critical agreement to purchase the right to manufacture and sell the drug, but was only "on the verge of signing" such an agreement.  *See Retrophin*, 41 F. Supp. 3d at 910, 915.  By contrast, here Ixchel had already signed the key agreement with Forward that guaranteed Ixchel's access to the necessary resources to bring its new drug to market, and the parties were operating under that agreement at the time Biogen engaged in its anticompetitive acts.

Indeed, it was because of the very real threat that the Ixchel-Forward relationship posed to its business that Biogen sought to disrupt that relationship.  Thus, taking all of these factors into consideration, there are ample factual allegations to show that Ixchel had the requisite intent and preparedness to be a real competitor to Biogen.

### 3.  Ixchel Has Suffered an Antitrust Injury

Contrary to Biogen's assertion, Ixchel has properly alleged an antitrust injury.  First, Biogen incorrectly argues that antitrust injury is a separate essential element for an antitrust claim.  In fact, "[a]ntitrust injury is a component of the standing inquiry, not a separate qualification." *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1182 (5th Cir. 1988).  Thus, it is error for a court to find that a plaintiff has antitrust standing but dismiss the antitrust claim for lack of antitrust injury.  *See id.*

For the reasons already set forth in detail above, Ixchel does have proper standing to bring an antitrust claim against Biogen.  Biogen's anticompetitive interference in Ixchel's business relationship with Forward has excluded Ixchel from the market for DMF drugs, causing Ixchel lost development costs as well as lost royalties and prohibiting Ixchel from bringing its competitive product to the marketplace.  Ixchel has therefore suffered exactly the type of injury that the antitrust laws were intended to prevent.  *See Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 174

(3d Cir. 2015) (higher costs inflicted on plaintiff as a result of defendant's anticompetitive conduct qualified as antitrust injury).

All of Biogen's arguments to the contrary lack merit. First, Biogen repeats the same argument that Ixchel's damages are too speculative because Forward has independently decided to suspend all drug development activities. But as explained above, Forward's decision is not independent of Biogen's conduct, but rather in direct reaction to the anticompetitive agreement that Biogen entered into with Forward that forms the basis of Ixchel's antitrust claim.

Second, Biogen incorrectly asserts that Ixchel has not properly pleaded a relevant market. The FAC defines the relevant market as "drugs containing DMF as an API for the treatment of neurological diseases." (FAC ¶ 15). The FAC further defines the geographic market as the United States, and explains that this constitutes the geographic market given the extensive regulation of drug products by the FDA. (*See id.* at ¶ 16). Still further, the FAC explains why any drug containing DMF as an API to treat a neurological disease would be reasonably interchangeable as a substitute for another drug containing DMF as an API to treat another neurological disease. (*See id.* at ¶¶ 17-19). These allegations present a plausible market and thus meet the pleading requirements for defining the relevant market.[9]

Biogen argues that Ixchel has defined the relevant market too narrowly because, in Biogen's view, there are non-DMF drugs that compete or could compete with Biogen's Tecfidera product. But Biogen's dispute over Ixchel's market definition is a factual dispute that requires discovery to resolve, and is not an appropriate issue for resolution at the pleading stage. *See AFMS, LLC v. United Parcel Service Co.*, No. 10-05830 MMM (AJWx), 2011 WL 13128436, at *13 (C.D. Cal. Nov. 23, 2011) ("defining the product market is a highly factual matter best suited to resolution at a later stage of the

---

[9] *Tanaka v. University of Southern California*, 252 F.3d 1059 (9th Cir. 2001), cited by Biogen, is inapposite. In that case, the plaintiff's alleged relevant market of a single athletic program in the Los Angeles area was based purely on the plaintiff's subjective preference on where she wanted to go to school and thus, on its face, implausible. *See id.* at 1063-64. Likewise, *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011), is inapposite. In *Bayer*, the party asserting the antitrust claim admitted in its pleadings that there were other drugs that could treat the target disorder (PMDD) but failed to explain why those other drugs should not be included in the alleged relevant market. That is not an issue here because Ixchel has not alleged that there are any other drugs available on the market that could be used for the same purpose as Tecfidera.

proceeding unless the complaint reveals a 'fatal legal defect' in the market alleged."); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 997 (N.D. Cal. 2010) ("the question of whether the market should include other products is better resolved at the summary judgment stage, rather than on a motion to dismiss."); *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1136 (N.D. Cal. 2010) ("Ellie Mae's factual contentions about the available network substitutes discussed in its SEC filing are not appropriate for resolution at the pleadings stage."). Indeed, to the extent Biogen argues that there are non-DMF drugs that could be used to treat multiple sclerosis instead of Tecfidera, such drugs are not reasonable substitutes because the potential side effects of such drugs would be different from DMF, thereby making such other drugs not viable options for many patients suffering from multiple sclerosis. In any event, fact discovery would be necessary to resolve the issue of whether other drugs should be included in the relevant market.

Moreover, Biogen's assertion that other companies "have developed and are presently developing drugs intended to compete with and substitute for Tecfidera" lacks merit. (Biogen Mot. at 24:8-10). To support this assertion, Biogen relies on the same three exhibits that, for the reasons discussed in Section II.C. above, should be excluded from the court's consideration: an inadmissible hearsay statement by a third party as to who it subjectively views as the competitors for Tecfidera, and inadmissible website printouts that, at best, simply show that other companies are investigating potential new drugs to treat multiple sclerosis. Thus, the so-called evidence presented by Biogen does not show that there are reasonable substitutes for Tecfidera.

Biogen also ignores that Ixchel has alleged that Biogen's conduct constitutes an antitrust violation under both the *per se* rule and the rule of reason. For a *per se* antitrust violation, a plaintiff need not allege anticompetitive conduct in any defined relevant market. *See Knevelbaard Diaries v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2002) ("When a per se violation such as horizontal price fixing has occurred, there is no need to define a relevant market or to show that the defendants had power within the market."); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1101-02 (9th Cir. 1999) ("Elaborate market analysis and case-by-case evaluation are unnecessary in cases involving per se antitrust violations because the anticompetitive effects of the practice are presumed."). Thus,

Biogen's complaints as to deficiencies in Ixchel's pleading of the relevant market are irrelevant to Ixchel's claim of a *per se* antitrust violation.

Biogen also incorrectly argues that neither Ixchel nor Forward are of any competitive significance in the market. Biogen's anticompetitive actions to exclude these companies from the DMF drug market clearly belie this claim. Moreover, Biogen's suggestion that any other company could enter the DMF drug market lacks merit. As set forth in the FAC, there are substantial barriers to entry in this market, and at the present time no other company is attempting to enter the market. (*See* FAC ¶¶ 17, 20, 37). Biogen's speculation that some other company might attempt to enter the market in the future is therefore irrelevant.

Finally, contrary to Biogen's argument, the FAC properly alleges and explains how competition and consumers are harmed by Biogen's conduct. First, there is currently no FDA-approved treatment for Friedreich's ataxia. (*See id.* at ¶ 8). By preventing Ixchel from bringing its new DMF drug to the market, Biogen is contributing to the suffering of Friedreich's ataxia patients who are being denied this potentially life-saving drug. In addition, as set forth in the FAC, if Ixchel were successful in bringing its new DMF drug to the marketplace, that drug could be prescribed by physicians to patients as an "off-label" substitute for Tecfidera, thereby creating competitive pressure on Biogen to decrease the price of Tecfidera for multiple sclerosis patients. (*See* FAC ¶¶ 18, 19). Thus, by preventing Ixchel from bringing its new DMF drug to the market, Biogen is also stifling competition and harming consumers through its pricing of Tecfidera, which has been artificially inflated based on its monopoly power in the market. (*See id.* at ¶¶ 37, 45). This is not a conclusory allegation of harm, as Biogen argues, but a sufficiently detailed and rational explanation of how Biogen's conduct has harmed competition and is bad for consumers.

### 4. Ixchel Has Properly Pleaded a Substantive Sherman Act Claim

#### a) Ixchel Has Properly Pleaded a Rule of Reason Violation

Biogen incorrectly asserts that Ixchel has not adequately pleaded a Rule of Reason violation of the Sherman Act. Biogen argues that Ixchel's complaint is deficient because Ixchel has not alleged harm to competition in the market as a whole. But as discussed above, the FAC contains a detailed

1    explanation of how Biogen's conduct has harmed competition in the market for DMF drugs. Thus, there

2    is nothing deficient in Ixchel's pleading of an antitrust violation under the Rule of Reason.

3                    **b)    Ixchel Has Properly Pleaded a *Per Se* Violation**

4           Finally, Ixchel has properly pleaded a *per se* violation of the antitrust laws. First, Biogen

5    incorrectly argues that a group boycott requires an agreement between competitors to disadvantage

6    another competitor. This is contradicted by one of the very cases cited by Biogen, *Topps Chewing Gum,*

7    *Inc. v. MLBPA*, 641 F. Supp. 1179 (S.D.N.Y. 1986), which states that "in a classic group boycott, a

8    group of businesses combine to exclude other competitors ***or potential competitors*** from their level of

9    the market. *Id.* at 1187 (emphasis added). *See also Brown v. Visa U.S.A., Inc.*, 674 F. Supp. 249, 254

10   (N.D. Ill. 1987) ("A group boycott is the banding together of certain market players with the goal of

11   gaining market power at the expense of market competitors ***or potential competitors***.") (emphasis

12   added). Biogen's suggestion that there can be no *per se* violation because Ixchel is not currently

13   competing against Biogen is therefore wrong as a matter of law. And as discussed above, Ixchel was

14   certainly a potential competitor of Biogen because it meets the test for having an "intent and

15   preparedness" to enter the market for DMF drugs.

16          Second, Biogen incorrectly argues that Ixchel has not alleged that Biogen cut off access to a

17   resource that was necessary for Ixchel to compete. As set forth in the FAC, Ixchel needed its business

18   partner, Forward, to help develop and market the new DMF drug. Biogen argues that Ixchel is not

19   precluded from finding a new business partner to take Forward's place, but such an argument is pure

20   speculation and, as such, is entitled to no weight. Indeed, as Biogen itself argues, the costs of running

21   the necessary clinical trials to get a drug through the FDA approval process can be as high as over $800

22   million. (*See* Dkt. No. 20-1 at 6:22-23). Given these high costs, Biogen's suggestion that it will be easy

23   for Ixchel to find a new partner to replace Forward is completely unrealistic. Instead, the allegations in

24   the FAC support that Ixchel cannot reasonably duplicate the resources that it had access to through its

25   Collaboration Agreement with Forward, which is enough to support a claim of a *per se* group boycott or

26   refusal to deal. *See In re Air Passenger Computer Reservations Sys. Antitrust Litigation*, 694 F. Supp.

27

28

1443, 1451 (C.D. Cal. 1988) ("An essential facility is one which cannot be reasonably duplicated and to which access is necessary if one wishes to compete.").

Third, Biogen's reliance on *FTC v. Actavis, Inc*., 133 S. Ct. 2223 (2013), is misplaced. In *Actavis*, the Supreme Court held that a "reverse payment" settlement agreement – where a patentee pays money to an accused infringer in return for the accused infringer's agreement not to sell the allegedly infringing product – is not *per se* illegal under antitrust law, but subject to a rule of Rule of Reason analysis. *See id.* at 2227, 2237. But the question here is not the legality of a reverse payment settlement agreement. Rather, the conduct that is being challenged is the agreement between two competitors, Biogen and Forward, that they will refuse to engage in any business dealings with a third potential competitor in the marketplace, Ixchel. *Actavis* is therefore entirely inapposite. The fact that there are other terms in the Biogen-Forward contract that relate to the licensing of patent rights is entirely irrelevant, as those are not the terms that Ixchel has identified as being anticompetitive. Rather, the alleged anticompetitive term in the Biogen-Forward contract is the entirely separate agreement between Biogen and Forward to squeeze Ixchel out of the market for DMF drugs, which has nothing to do with any party's patent rights.

Indeed, while Biogen argues that the contractual provision prohibiting Forward from any further dealings with Ixchel "on its face protects the rights Biogen licensed from Forward," this argument makes no sense. (Biogen Mot. at 29:7-8). Ixchel has nothing to do with any of the patent rights that Forward may have licensed to Biogen. Thus, it is difficult to conceive of how Forward's business relationship with Ixchel would affect any rights licensed to Biogen.

**E.     Ixchel Has Properly Pleaded a California Cartwright Act Claim**

Ixchel has also properly pleaded a state law antitrust claim under California's Cartwright Act (the fifth cause of action). As Biogen points out, the analysis under the Cartwright Act "mirrors the analysis under federal law." *County of Tuolumne v. Sonora Cmty. Hosp*., 236 F.3d 1148, 1160 (9th Cir. 2001). Thus, for the same reasons discussed above with respect to Ixchel's Sherman Act claim, Ixchel has properly pleaded an antitrust claim under the Cartwright Act.

In addition, the Cartwright Act does differ in one significant respect from the Sherman Act: "the more restrictive definition of antitrust injury under federal law does not apply to the Cartwright Act." *Knevelbaard*, 232 F.3d at 991 (internal quotations omitted). This is because the Cartwright Act "reaches beyond the Sherman Act to threats to competition in their incipiency . . . and thereby goes beyond 'clear-cut menaces to competition' in order to deal with merely 'ephemeral possibilities.'" *Cianci v. Superior Court*, 40 Cal. 3d 903, 918 (1985). As a result, standing under the Cartwright Act is broader than standing under the Sherman Act, in that any person who has been "injured in his or her business or property" by reason of any violation of the Cartwright Act has standing to sue for a Cartwright Act violation, regardless of whether they are a direct consumer or competitor of the defendant.[10] *See Cellular Plus, Inc. v. Superior Court*, 14 Cal. App. 4th 1224, 1233 (1993). Thus, to the extent Biogen argues that Ixchel lacks standing to bring a Sherman Act claim against it because Ixchel does not compete with Biogen or is not a participant in the same market as Biogen, such arguments do not apply to Ixchel's Cartwright Act claim. *See id.* Instead, the mere fact that Ixchel was injured in its business as a result of Biogen's anticompetitive conduct confers standing on Ixchel to assert a Cartwright Act claim.

### F.    Ixchel Has Properly Pleaded a Claim for California Unfair Competition

Finally, Ixchel has properly pleaded a claim for unfair competition (the sixth cause of action). Biogen fails to identify any specific deficiency in Ixchel's pleading of its California unfair competition claim. Instead, Biogen argues that this claim is entirely derivative of Ixchel's other claims, and since all the other claims in the complaint should be dismissed, so should the unfair competition claim. But as discussed, the other claims in Ixchel's complaint have in fact been sufficiently alleged. Biogen's request for dismissal of the unfair competition claim should therefore be denied. *See Retrophin*, 41 F. Supp. 3d at 918 ("Retrophin's claim for violation of California Business & Professions Code section 17200 is derivative of Retrophin's other claims. . . . Because Retrophin sufficiently alleges its other claims, it sufficiently alleges a violation of California Business & Professions Code section 17200 as well.").

---

[10] Indirect purchasers, for example, have standing to sue under the Cartwright Act whereas they lack standing to sue under the Sherman Act. *See Crown Oil Corp. v. Superior Court*, 177 Cal. App. 3d 604, 612 (1986).

In addition, under section 17200, "a practice may be deemed unfair even if not specifically proscribed by some other law." *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Thus, even if the Court were to find that all of Ixchel's other claims should be dismissed, that would not necessitate dismissal of Ixchel's unfair competition claim. To the contrary, Biogen's conduct can still be deemed an unfair business practice under the UCL even if the Court finds that Biogen's conduct does not violate any other statute or regulation. *See id.* at 183 ("To forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct."); *Knevelbaard*, 232 F.3d at 994 ("a plaintiff may bring an unfair competition claim under California law unless some other provision bars the action by clearly permitting the conduct.").

### G. To the Extent the Court Finds any Deficiencies in the Factual Allegations in the Complaint, the Court Should Grant Ixchel Leave to Amend

Finally, to the extent the Court finds that any of Ixchel's claims are deficiently pled, the Court should grant Ixchel leave to amend the FAC to address those deficiencies. *See Lopez*, 203 F.3d at 1127 (on a Rule 12(b)(6) motion, "a district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts."). As set forth above, on the undisputed facts of this case alone, it is apparent that Biogen acted intentionally to interfere with Ixchel's contract with Forward. Thus, this case clearly has substantive merit. If the Court believes that the complaint does not clearly set forth the necessary allegations for any of Ixchel's claims, however, Ixchel can certainly provide an amended complaint with additional factual allegations as described in this opposition brief to further support its claims.

## V.  CONCLUSION

Biogen has failed to present any reasonable basis for dismissing this case. This Court has original jurisdiction over Ixchel's federal antitrust claim, and diversity as well as pendent jurisdiction over the state law claims. In addition, each of Ixchel's causes of action has been properly pleaded. Ixchel has properly asserted a tortious interference with contract claim – a claim that does not require proof of any wrongful conduct apart from the interference itself. In addition, the independently wrongful conduct requirement for Ixchel's separate claims for interference with prospective economic advantage is met by

Ixchel's allegations that Biogen violated the Sherman Act, the Cartwright Act, and California's Unfair Competition Law. As for Ixchel's antitrust claims, as a developer of a competing product and the direct target of Biogen's anticompetitive acts, Ixchel has suffered antitrust injury and has standing to bring its antitrust claims under both the Sherman and Cartwright Act. And finally, Biogen fails to identify any specific deficiency in Ixchel's pleading of its unfair competition claim. Thus, Biogen's request to dismiss this case under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) should be denied.

Dated: August 11, 2017                    Respectfully submitted,


                                          */s/ Christopher D. Banys*
                                          Christopher D. Banys

                                          BANYS, P.C.
                                          Christopher D. Banys   (State Bar No. 230038)
                                            cdb@banyspc.com
                                          Richard C. Lin  (State Bar No. 209233)
                                            rcl@banyspc.com
                                          Jennifer L. Gilbert  (State Bar No. 255820)
                                            jlg@banyspc.com
                                          Christopher J. Judge  (State Bar No. 274418)
                                            cjj@banyspc.com
                                          BANYS, P.C.
                                          1032 Elwell Court, Suite 100
                                          Palo Alto, CA  94303
                                          Tel:  (650) 308-8505
                                          Fax:  (650) 353-2202

                                          Attorneys for Plaintiff
                                          IXCHEL PHARMA, LLC

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically through the Court's CM/ECF system on August 11, 2017 in compliance with L.R. 133.  Therefore, this document was served on the following counsel for Defendant who are deemed to have consented to electronic service:

Mark S. Popofsky
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
mark.popofsky@ropesgray.com
(202) 508-4600

Rocky C. Tsai
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
rocky.tsai@ropesgray.com
(415) 315-6300

/s/ *Tiffany T. Dang*
Tiffany T. Dang